

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-14-1998

# United States v. Idowu

Precedential or Non-Precedential:

Docket 98-5076

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"United States v. Idowu" (1998). *1998 Decisions*. Paper 246.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/246

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed October 14, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 98-5076

UNITED STATES OF AMERICA

v.

ISMOILA IDOWU,
Appellant

On Appeal From the United States District Court
For the District of New Jersey
(D.C. Crim. No. 97-cr-00214-2)

Argued: July 17, 1998

Before: BECKER, Chief Judge, STAPLETON and WEIS,
Circuit Judges.

(Filed October 14, 1998)

        EDNA B. AXELROD, ESQUIRE
          (ARGUED)
        443 Northfield Avenue
        West Orange, NJ 07052

        Attorney for Appellant

        FAITH S. HOCHBERG, ESQUIRE
        United States Attorney

        GEORGE S. LEONE, ESQUIRE
          (ARGUED)
        Assistant United States Attorney
        970 Broad Street - Room 502
        Newark, NJ 07102
        Chief of Appeals

        Attorneys for Appellee

OPINION OF THE COURT

BECKER, Chief Judge.

The evidence at the trial of Ismoila Idowu on the charge of conspiracy to possess with intent to distribute more than one kilogram of heroin, 21 U.S.C. S 846, made it crystal clear that Idowu was -- and knew that he was -- involved in an illicit transaction of some sort. There also is no question that the transaction that was the subject of the government's undercover investigation and surveillance, in which Idowu's co-defendant Monadu Ajao was the buyer, involved more than one kilogram of heroin. The sole question on Idowu's appeal, following his conviction by a jury, is whether there was sufficient evidence that Idowu knew that the subject matter of the transaction was a controlled substance, rather than some other form of contraband, such as stolen jewels or computer chips or currency, such proof being necessary to support Idowu's conviction.1

We have consistently held in cases of this genre that, even in situations where the defendant knew that he was engaged in illicit activity, and knew that "some form of contraband" was involved in the scheme in which he was participating, the government is obliged to prove beyond a reasonable doubt that the defendant had knowledge of the particular illegal objective contemplated by the conspiracy. See, e.g., United States v. Thomas, 114 F.3d 403, 405 (3d Cir. 1997); United States v. Wexler, 838 F.2d 88, 90 (3d Cir. 1988). We also have consistently held that, in the absence of such proof, a guilty verdict on a conspiracy charge cannot be sustained. See Thomas, 114 F.3d at 406; Wexler, 838 F.2d at 91. We think that the evidence that Idowu knew that heroin or some other controlled substance was involved is lacking here. Accordingly, we will reverse the judgment.

_____

1. Idowu also challenged the admission of testimony regarding the money that was seized from him. Since we conclude that, even with the admission of this testimony, there was insufficient evidence to convict Idowu, we do not reach this argument.

2

I.

The events leading up to Idowu's March 24, 1997, arrest in Jersey City, New Jersey, began two months earlier in Lahore, Pakistan. At that time, the United States Drug Enforcement Agency (the "DEA") in Pakistan seized over two kilograms of heroin in the course of an undercover operation. The agency used the seized heroin as part of a sting operation that targeted prospective purchasers in the United States. Pakistani drug dealers, believing that their co-conspirators still possessed the heroin, were led to contact Abdul Khaliq, who actually was a DEA informant. During a telephone call organized by another DEA operative, a man who identified himself as "Raja" told Khaliq that someone would call him to arrange to purchase the heroin.

Several weeks later, Monadu Ajao, who identified himself as Raja's friend, and who became Idowu's co-defendant, telephoned Khaliq. During the course of six telephone conversations, which were taped by Khaliq, Ajao negotiated to buy the heroin. Khaliq and Ajao ultimately agreed to meet at a Quality Inn parking lot in Jersey City, New Jersey on March 24, 1997. Throughout the telephone negotiations, Ajao never mentioned Idowu, nor did he specifically mention heroin. Ajao did indicate that he was acting on behalf of others, and at one point implied that another man was helping him to gather the money he was to pay to Khaliq.

On March 24, DEA agents set up surveillance at the Quality Inn. They wired Khaliq with a concealed tape recorder and transmitter so that they could monitor the transaction from a nearby car. That afternoon, Ajao arrived at the Quality Inn in a black Lincoln Town Car driven by Idowu. Ajao and Idowu left the car and entered the hotel lobby, Idowu carrying a brown leather bag. The two men then exited the lobby, re-entered the sedan, and moved it to another location in the parking lot. Khaliq arrived in a Ford Explorer with a black suitcase in his trunk; the DEA had previously outfitted the suitcase to hold drugs in its lining.[2]

_____

2. This was the same suitcase that the DEA seized in Pakistan in its undercover operation there.

Ajao got out of the Town Car and introduced himself to Khaliq. Idowu remained in the vehicle. Ajao and Khaliq discussed the payment, which was to have been $30,000. Ajao told Khaliq that he only had brought $20,000. Idowu was unable to hear their conversation. Ajao and Khaliq then returned to the Town Car. Ajao encouraged Khaliq to get into the car, but Khaliq declined Ajao's offer. Ajao, sitting in the front seat of the Town Car, continued to talk to Khaliq, who remained standing outside. Ajao and Idowu then exited the vehicle, at which point Khaliq met Idowu for the first time. When Khaliq asked who Idowu was, Ajao replied that "he is driver."

All three gathered near the trunk of the Town Car. Idowu opened the trunk, which contained the brown leather bag; he then opened the bag, displaying the money inside to Khaliq. As Khaliq counted the money, Khaliq stated that he would have to take the bag with him. Idowu had some documents in the bag, and Khaliq told Idowu, who wanted to get the bag back, that Idowu could "pull [the documents] out" and that he would return the bag to Idowu the next day. Idowu told Khaliq that he had checked the money himself, and that all $20,000 was there.

Khaliq took the bag of money to the Ford and opened the rear hatch. Idowu, who previously had pulled the Town Car into a spot next to the Ford, then removed the specially-outfitted black suitcase from Khaliq's car and placed it into the still-open trunk of the Town Car. Idowu unzipped the black suitcase and, on seeing nothing inside, told Ajao, "They didn't pack this thing." Ajao told Idowu to press the suitcase with his hands. Khaliq tried to reassure Ajao and Idowu by explaining that something was concealed in the frame of the suitcase. Moments later, the DEA arrested Ajao and Idowu.

The DEA agents recovered $3,000 in cash from Idowu's right front pocket, $495 from his back pocket, and $18,000 in cash from the brown leather bag.

II.

As both Idowu and the government correctly point out, we "must determine whether, viewing the evidence most

4

favorably to the government, there is substantial evidence to support the jury's guilty verdict." Wexler, 838 F.2d at 90 (citing Glasser v. United States, 315 U.S. 60, 80 (1942)). "The elements of a conspiracy may be proven entirely by circumstantial evidence, but each element of the offense must be proved beyond a reasonable doubt." 838 F.2d at 90 (citations omitted). One element the government must show in a conspiracy case is that "the alleged conspirators shared a `unity of purpose', the intent to achieve a common goal, and an agreement to work together toward the goal." Id. at 90-91. In order for us to sustain a defendant's conviction for conspiracy, the government must have put forth evidence "tending to prove that defendant entered into an agreement and knew that the agreement had the specific unlawful purpose charged in the indictment." Id. at 91. See also United States v. Scanzello, 832 F.2d 18, 20 (3d Cir. 1987).

Idowu acknowledges that the evidence tends to show that he reached some kind of agreement with Ajao and that he knew that he was involved in some form of illicit activity. Nevertheless, he contends that the evidence offered at trial is insufficient to prove beyond a reasonable doubt that he knew that the purpose of the illicit transaction was to obtain possession of a controlled substance.

The government points to a series of acts by Idowu that, in its opinion, prove that Idowu knew he was part of a drug deal. First, Idowu carried the brown leather bag containing the money. Second, Idowu apparently owned the bag, as evidenced by the fact that he kept personal documents in the bag. Third, Ajao was willing to leave Idowu alone with the money. Fourth, Ajao believed that it was safe to talk to Khaliq in the presence of Idowu. Fifth, Idowu was the one who showed Khaliq the money and who told Khaliq that he had checked it to ensure that it was all there. Sixth, Idowu opened the black suitcase to check the contents without being prompted by Ajao. Seventh, the two defendants spoke Yoruban (a Nigerian dialect) together. Eighth, Ajao urged Idowu to feel around in the suitcase. Ninth, Idowu had $3,000 in his pocket at the time he was arrested, which he presumably had skimmed from the stash.

5

From these facts, the government attempts to draw a number of inferences about Idowu's behavior. However, only two inferences are proper: that Idowu had some kind of preexisting relationship with Ajao, and that Idowu knew he was participating in some sort of illegal transaction. But the evidence does not support the critical inference on which the government's case depends -- that Idowu knew the transaction was a drug transaction. Neither Ajao nor Khaliq referred to the subject of their deal as "heroin" or "drugs" in Idowu's presence on the day of the transaction, or in their recorded phone conversations. Instead, they referred to the subject matter of the deal as "the stuff," which can describe a variety of contraband. Nor did Idowu take part in any of the recorded conversations with Khaliq that preceded the March 24 transaction. While Idowu may have known that the object of the sale was small enough to be placed in a suitcase, a wide variety of contraband items can fit into a container of that size, including stolen jewelry, laundered money, stolen computer chips, and counterfeiting plates. At no time did Idowu give any indication that he knew what Ajao was purchasing with the money.

The government's strongest argument is that Ajao's invitation to Khaliq to get into the car, in which Idowu was sitting, reflects such total confidence in Idowu that an inference can be drawn that Idowu knew the full nature of the transaction. "Inferences from established facts are accepted methods of proof when no direct evidence is available so long as there exists a logical and convincing connection between the facts established and the conclusion inferred." United States v. Clemmons, 892 F.2d 1153, 1159 (3d Cir. 1989). However, the government's argument actually relies on two interdependent inferences, at least one of which lacks a convincing connection between the facts and the conclusion.

The first inference is that, by inviting Khaliq into the car to talk, Ajao was willing to speak freely in front of Idowu. While we can only speculate what they might have talked about in the car, we think there are a number of more viable explanations for Ajao's invitation to Khaliq. It might have been merely a friendly, confidence-inspiring gesture.

6

Moreover, the record suggests that Ajao was apprehensive that he was under surveillance, so he may have invited Khaliq into the car because he wanted to drive somewhere else to complete the deal. But even if we accept that a reasonable jury could infer that Ajao felt comfortable speaking in front of Idowu, the second inference-- that because Ajao was willing to speak about the transaction in the presence of Idowu, Idowu must already have been aware of the deal's subject matter -- is entirely without support in the record, regardless of how favorably to the government the evidence is viewed.3 Because the government has presented no evidence that would justify the jury's inferential leap between the second inference and the conclusion, and because we do not think the first assumption alone, without the support of the necessary second assumption, is a strong enough foundation on which to ground the conviction, we cannot hold that the government has presented evidence sufficient for the jury to find that the government proved Idowu's knowledge beyond a reasonable doubt.

Our case law supports the conclusion that it was unreasonable for the jury to infer that Idowu knew of the transaction's ultimate purpose. In United States v. Thomas, 114 F.3d 403 (3d Cir. 1997), a drug courier named Lynch, after being arrested, agreed to cooperate with the DEA by following through on a plan to drop off a suitcase in a motel room. Defendant Thomas, acting on a communication from someone named "Cliff," picked up the room key and entered the room that contained the suitcase, in accordance with the arrangements Lynch had made with her co-conspirator, Petersen. Thomas then left the room without the suitcase and without drugs. Upon being arrested, Thomas explained that he had been offered $500 to check on the luggage. See id. at 404-05.

Much like Idowu, Thomas conceded that there was "evidence tending to show that he entered into some kind

_____

3. We note in passing that it is not uncommon for managers of clandestine illegal operations to keep their employees insulated from one another and from the overall plan of operation so that they cannot supply evidence against others involved.

of agreement," but he contended "that the evidence presented at trial [was] insufficient to prove beyond a reasonable doubt . . . that he knew that the purpose of the agreement was the specific unlawful purpose charged in the indictment, i.e., the possession of a controlled substance with intent to distribute." 114 F.3d at 405. We agreed with Thomas, noting that the government failed to prove the substance of the phone calls made from "Cliff " to Thomas and that it failed to offer evidence that Thomas ever spoke to Lynch or Petersen at all. Finally, we pointed out that the government's evidence failed to controvert Thomas's proffered explanation for his actions, which was that he had received a phone call from Cliff asking him simply to go into the hotel room and to leave the door unlocked on the way out. We concluded that "there is no evidence from which a jury could permissibly infer that Thomas knew that the object of the conspiracy was to possess cocaine," and therefore that "the evidence cannot support Thomas' conspiracy conviction." Id. at 406.

Like the prosecution in Thomas, the government here has failed to prove that the defendant ever heard specific reference to the subject matter of the transaction in which he was involved. The government would have us distinguish Thomas on the ground that Thomas had presented a credible alternative explanation for his acts, where Idowu did not offer an alternative explanation for his participation. However, in refusing to uphold Thomas's conviction, we relied not on the presence of a convincing alternative explanation by the defendant but on the total absence of evidence showing that Thomas knew that cocaine was involved. Thomas, 114 F.3d at 406. Therefore, the credibility of Idowu's explanation of his role in the transaction is not a factor, and cannot make up for the lack of specific evidence of Idowu's knowledge of the transaction's subject matter.

United States v. Wexler, 838 F.2d 88 (3d Cir. 1988), further supports our conclusion. In Wexler, the court noted that there was "ample circumstantial evidence . .. from which the jury could have concluded that Wexler was involved in a conspiracy" to transport some kind of contraband in a Ryder truck. 838 F.2d at 91. Such

8

evidence included the fact that Wexler drove the car in a manner that suggested he was a lookout for the truck, that Wexler had a fraudulently-obtained CB radio in his car when he was arrested, that he made a gesture that appeared to signal one of the conspirators, and that he spoke with another conspirator several times during the operation. Id. However, we concluded, "What is missing is any evidence that Wexler knew that a controlled substance was couched behind the doors of the Ryder truck." Id. Because "[t]hat knowledge is an essential element of the conspiracy charged," and because "keeping bad company" is not sufficient grounds on which to convict a defendant for conspiracy, the conviction was overturned. Id.

The government tries to distinguish the facts in Wexler from the facts in the present case. It argues that unlike Wexler, who appeared to be on the outside edge of the conspiracy, Idowu was a "trusted member" of the conspiracy. In support of this argument, the government points to the fact that Idowu was entrusted with a large amount of cash, that he possessed the keys to his own car trunk (where the cash was kept), that he knew $20,000 was the correct amount of money, that he assured Khaliq that it was all there, and that, upon finding nothing in the black suitcase, he reacted as if he had expected to inspect the contents. Taking all these points as true, the government -- as in Wexler -- still has failed to show that Idowu knew what the deal was about. The fact patterns both in Wexler and in the case at bar are consistent with transactions that do not involve drugs of any sort. And because the government failed to provide evidence that Idowu knew that drugs were in fact the subject matter of the transaction, the jury could not draw a permissible inference that Idowu had knowledge of the nature of the deal.4

_____

4. While not the basis for our decision, we note that there is evidence that makes it quite possible that Idowu was someone quite different from the "trusted confederate" the government would make him out to be. It appears that Idowu had skimmed at least some of the $3,000 found in his pocket from the stash of money in the brown leather bag. The bag was supposed to have held $20,000, but instead held only $18,000. If Idowu did skim money from the bag, this suggests that far from being a co-conspirator playing an integral role in the exchange, Idowu was a

9

III.

In light of our case law and of the specific facts in this case, we conclude that there was an absence of evidence that Idowu knew the subject matter of the transaction was the purchase of more than one kilogram of heroin. We therefore hold that no reasonable jury could have concluded that the government had met its burden of proof, which requires proof beyond a reasonable doubt. Accordingly, the judgment of the district court will be reversed.

_____

dishonest driver with his own agenda. If the government's theory is correct, Idowu was about to become the partial owner of $165,000 worth of heroin. The fact that Idowu may have felt it worth the risk to skim a petty $3,000 suggests that Idowu was not involved in the heart of the transaction and that the government is therefore incorrect.

STAPLETON, Circuit Judge, dissenting:

The court's majority opinion provides a fair account of the evidence. Unlike my colleagues, I conclude that this evidence supports the verdict against Mr. Idowu.

The evidence indisputably supports the proposition that Ajao intended to purchase a large quantity of heroin from Khaliq in the parking lot of the Quality Inn. The evidence also indisputably supports the proposition that Idowu committed himself to facilitate the anticipated parking lot transaction. He drove Ajao to the site with the cash, he transported the cash in his own suitcase, he represented to the seller that he had counted the cash himself and it was sufficient to cover the purchase price, and he attempted to confirm that the merchandise being purchased was in Khaliq's black suitcase. Finally, as the court acknowledges, the evidence indisputably supports the proposition that Idowu must have known that the transaction he committed to facilitate was an illicit one. The only reasonable doubt to which the court can point is the possibility that Idowu committed himself to facilitate a $20,000 illicit transaction either without knowing the unlawful objective to be achieved or having been misled about that objective.

Given the inherent risk, it is an extremely rare occurrence when a person commits himself to facilitating a large illicit transaction without ascertaining the objective to be achieved. Moreover, the evidence with respect to Idowu's circumstances establishes that he was a trusted confidant of Ajao. Ajao was comfortable negotiating the transaction in Idowu's presence as well as with Idowu's having sole custody of the cash in Ajao's absence. This makes it even more unlikely that Idowu and Ajao failed to discuss why they were going to the Quality Inn parking lot or that Ajao misled Idowu into believing they were paying $20,000 for explosives, diamonds or computer chips. Finally, the evidence establishes that Idowu was at least tacitly assigned the task of checking Khaliq's black bag to confirm that Ajao was getting what was being paid for, an assignment Idowu would not have received if he were unaware of what he was looking for. Based on this common sense approach to the evidence, I conclude that the jury

11

properly could conclude that Idowu was guilty as charged beyond a reasonable doubt.

I would affirm the judgment of the district court.

A True Copy:
Teste:

   Clerk of the United States Court of Appeals
   for the Third Circuit

12