**UNITED STATES of America,
Appellant,**

v.

**Ruben BORIA.**

No. 08–2550.

United States Court of Appeals, Third Circuit.

Argued on Dec. 15, 2009.

Filed Jan. 26, 2010.

Robert A. Zauzmer, Esq. [ARGUED], Karen S. Marston, Esq., Office of United States Attorney, Philadelphia, PA, for Appellant.

Anthony J. Petrone, Esq. [ARGUED], Cogan, Petrone & Associates, Philadelphia, PA, for Appellee.

Before: FISHER, HARDIMAN, and VAN ANTWERPEN, Circuit Judges.

## OPINION OF THE COURT

VAN ANTWERPEN, Circuit Judge.

The United States appeals the District Court's judgment of acquittal for Appellee–Defendant Ruben Boria ("Boria"). For the following reasons, this Court will reverse the judgment of acquittal and remand the matter to the District Court for further proceedings.

## I.

On February 5, 2007, Marcus Diaz ("Diaz") arrived in Philadelphia, Pennsylvania driving a tractor-trailer which contained one hundred kilograms of cocaine hidden among boxes of mostly rotten fruit. That same day, Jose Alvarado ("Alvarado"), a Drug Enforcement Agency ("DEA") informant, received a phone call from his long-time friend Miguel Morel ("Morel"), who was searching for a garage which could fit a tractor-trailer for unloading. Alvarado had previously assisted Morel with Morel's drug transportation business.[1] He then met with Morel and four other Mexican nationals, none of which were Boria. Alvarado was unable to locate a garage for Morel, but suggested an overnight parking location. Alvarado watched the truck that night and was in constant communication with Morel. At some point during the night, Alvarado managed to inform law enforcement about the load of cocaine.

On the morning of February 6, 2007, Alvarado returned to the parking lot to take Diaz to breakfast. When the two arrived at the diner, Alvarado received a phone call from Morel informing Alvarado that he had sent someone to take the tractor-trailer to a garage for unloading. Alvarado testified that he was told by Morel that Boria "was supposed to take the tractor-trailer from [Alvarado] and take it to a garage to unload the drugs that were in the back of the tractor-trailer." (App. 139.) On cross-examination, Alvarado maintained that Boria was responsible for "taking the truck from [his] hands to take it to another garage to unload it," (id. 144), and for "tak[ing] the driver of the tractor-trailer to finish off what needs to be done inside the truck," (id. 145).[2]

---

1. By way of background, this case concerns a large scale drug-trafficking organization operating in Mexico, Texas, and Pennsylvania. The organization distributed large quantities of cocaine and, in early 2007, members of the organization arranged the transportation by tractor-trailer of loads of 100 kilograms or more of cocaine from Texas to various locations in the United States. The specific charges in this case stem from the transportation of a 100–kilogram load of cocaine from Weslaco, Texas to Philadelphia, Pennsylvania. A DEA Special Agent testified that, in his experience, the organization typically arranged for someone to meet the driver of the tractor-trailer at its destination to assist with unloading the drugs. (App.45, 77–78.)

2. In addition, Alvarado testified that Morel typically employed others and operated in the background away from the drugs: "[Morel] was never really around the drugs, [the] majority of the time[. He pays] everyone else to do everything else" (App.144); "[Morel] stays in the background and he will not sit there and unload anything" (App.146); [Morel is] around when the original transaction goes down but when it comes to unloading and moving and everything else he keeps his distance" (App.147). Moreover, the details Morel shared with others "depend[ed] on their job, what they're supposed to do." (App.154–55.)

Morel informed Alvarado and Diaz that this man would identify himself as "Ruben," and Alvarado identified Boria as Ruben. When Alvarado and Diaz pulled into the parking lot, Boria approached the car and Diaz asked his identity.[3] Boria identified himself as Ruben and confirmed that Morel had sent him.[4] Alvarado acknowledged he had never before seen Boria. Diaz then climbed into the driver's side of the truck and Boria climbed into the passenger's side. The truck left its location with Alvarado following, at Morel's request, and eventually stopped in a K–Mart parking lot on Aramingo Avenue. Alvarado exited his car and approached the truck to ask Boria why they had stopped there because it was a "hot area." When Alvarado reached the tractor, Boria was on his cell phone. After Boria hung up, Alvarado asked where the truck was heading. Boria responded that he was going to a garage in North Philadelphia, but that he was waiting for someone to open it.

When the truck pulled out of the parking lot, it was stopped by the police, who had been observing the truck since receiving Alvarado's tip. The police then conducted a lawful search of the truck after a K–9 unit alerted to the presence of contraband. Police officers recovered a cell phone and $16.00 from Boria's person.[5] Boria's cell phone continued to ring after the police stop and throughout the search of the tractor-trailer. Police gained access to the locked trailer portion with a key on the ring they found in the ignition. After three hours of searching, the police located one hundred kilograms of cocaine hidden in boxes, which themselves were hidden in the middle of the trailer within pallets of mostly rotten fruit.

On April 18, 2007, a grand jury indicted Boria on two counts: (1) conspiracy to possess with intent to distribute five kilograms or more of cocaine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A), and (2) aiding and abetting the possession with intent to distribute five kilograms or more of cocaine in violation of 18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1) and (b)(1)(A).

At the close of the Government's case-in-chief, Boria moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29(a). The District Court reserved judgment on the motion. On January 25, 2008, after a four-day trial, the jury returned a verdict of guilty on each count of the indictment. Boria then renewed his motion for a judgment of acquittal and also filed a motion for a new trial under Rule 33, arguing the verdict was against the weight of the evidence and that the District Court erred in excluding a DEA report as inadmissible hearsay.[6]

3. Before Alvarado and Diaz returned to the parking lot, law enforcement officers conducting surveillance of the tractor-trailer observed Boria walk directly to the truck and peer into the driver's side. They then observed Boria use his cell phone as he walked away.

4. Boria's girlfriend and the mother of his child, Sonia Morales ("Morales"), testified that he had come home that morning at 3:00 a.m., but had left again by 6:00 a.m. when she woke up.

5. When the Government obtained call records for Boria's cell phone, it discovered fourteen calls during the one-hour time period preceding the stop. All the calls, nine outgoing and five incoming, were to a phone number assigned to Manuel Barroso ("Barroso"). Alvarado testified that Barroso "supplies people with drugs," (App.140), and Morales testified she he had heard Boria refer to Barroso as "cousin," (id. 261). The Government, however, failed to produce any evidence indicating that Boria actually spoke with Barroso that morning, let alone the substance of those fourteen calls.

6. The District Court did not resolve Boria's Rule 33 motion in light of its disposition of Boria's Rule 29 motion.

After hearing arguments, the District Court entered a judgment of acquittal for Boria finding the evidence of his knowledge of the objective of the conspiracy, i.e. the transportation of cocaine, insufficient. After identifying the appropriate standard of review as well as the cases relevant to this issue, the District Court found:

"there was no evidence that Mr. Boria was engaged in, or present during, any conversations about the cocaine that was hidden in the back of the trailer; no probative evidence of the substance of any communications in which Mr. Boria engaged; no evidence that Mr. Boria ever 'possessed' or saw the cocaine, or that he ever saw the back of the trailer unlocked; no evidence of any prior relationship between Mr. Boria and any coconspirators; and no evidence that Mr. Boria previously had been involved in any drug-trafficking activities."

(App.586.) Consequently, the District Court determined that a reasonable jury could not find that Boria knew the actual purpose of the conspiracy.

## II.

The District Court had original jurisdiction under 18 U.S.C. § 3231. We have appellate jurisdiction under 28 U.S.C. § 1291. The Government filed a timely notice of appeal.

■ On appeal from the grant of a judgment of acquittal, this Court exercises plenary review and independently applies the same standard a district court utilizes in deciding the motion. *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir.2005) (citing *United States v. Coleman*, 811 F.2d 804, 807 (3d Cir.1987)). We "review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Id.* (internal quotation marks and citation omitted). Accordingly, we will sustain the verdict if there is substantial evidence to uphold the jury's decision.[7] *United States v. Flores*, 454 F.3d 149, 154 (3d Cir.2006). Under this particularly deferential standard of review, a reviewing court "must be ever vigilant ... not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting [the court's] judgment for that of the jury." *Brodie*, 403 F.3d at 133.

■ Nevertheless, in a conspiracy case, we must closely scrutinize the Government's evidence because (1) slight evidence of Boria's connection to the conspiracy is not sufficient to support guilt and (2) guilt must remain individual and personal. *Id.* at 134. Thus, we review the evidence as a whole, not in isolation, and ask whether it is strong enough for a rational trier of fact to find guilt beyond a reasonable doubt. *Id.*

## III.

The Government argues that it presented sufficient evidence to enable the jury to find beyond a reasonable doubt that Boria knew he was transporting a controlled substance. The Government further asserts that the District Court improperly usurped the jury's function as the trier of fact.

Boria contends that his case falls within a line of our precedent finding that the

7. We are limited to a review of the evidence as it existed at the close of the Government's case-in-chief. Boria initially moved for a judgment of acquittal at the close of the Government's case and the District Court reserved judgment. Under Rule 29(b), the District Court was thus required to, and properly did, "decide the motion on the basis of the evidence at the time the ruling was reserved." Fed.R.Crim.P. 29(b); *see Brodie*, 403 F.3d at 133. Therefore, we review the evidence offered during the Government's case-in-chief, including evidence developed through cross-examination, but not evidence offered by Boria in his defense. *Brodie*, 403 F.3d at 133–34.

Government failed to offer evidence from which a rational trier of fact could logically infer that the defendant knew a controlled substance was involved in the transaction at issue. Boria thus asserts the District Court appropriately entered a judgment of acquittal.

### A.

■■■■ To establish a charge of conspiracy, the Government must show (1) a shared unity of purpose, (2) an intent to achieve a common illegal goal, and (3) an agreement to work toward that goal, which Boria knowingly joined. *United States v. Mastrangelo,* 172 F.3d 288, 291 (3d Cir. 1999); *see also United States v. Schramm,* 75 F.3d 156, 163 (3d Cir.1996) (asserting illegality is an essential element); *United States v. Kates,* 508 F.2d 308, 311 (3d Cir.1975) (requiring evidence that defendant "knowingly entered" conspiracy). These elements incorporate a requirement that Boria had knowledge of the specific illegal objective contemplated by the particular conspiracy, i.e. transporting a controlled substance.[8] *See United States v. Cartwright,* 359 F.3d 281, 287 (3d Cir. 2004); *Mastrangelo,* 172 F.3d at 291. The Government must establish each element beyond a reasonable doubt. *United States v. Coleman,* 811 F.2d 804, 808 (3d Cir. 1987).

■■■■ A conspiracy can be proven by direct or circumstantial evidence. *Brodie,* 403 F.3d at 134. Its existence can be inferred from evidence of related facts and circumstances from which it appears, as a reasonable and logical inference, that the activities of the participants could not have been carried on except as a result of a preconceived scheme or common understanding. *Id.* (citation omitted). Inferences drawn, however, must have a logical and convincing connection to the facts established—"[o]ur conspiracy case law forbids the upholding of a conviction on the basis of . . . speculation." *United States v. Thomas,* 114 F.3d 403, 406 (3d Cir.1997); *United States v. Casper,* 956 F.2d 416, 422 (3d Cir.1992).

### B.

■■■ To sustain a conviction for conspiracy with intent to distribute a controlled substance, we have consistently required the Government to introduce drug-related evidence, considered with the surrounding circumstances, from which a rational trier of fact could logically infer that the defendant knew a controlled substance was involved in the transaction at issue. In a series of cases, this Court has been reluctant to uphold drug conspiracy convictions unless the Government introduces evidence from which the jury could infer knowledge of drugs, as opposed to some other contraband.[9] *See, e.g., United States*

8. The indictment also charged Boria with aiding and abetting possession with intent to distribute a controlled substance. Under this charge, the Government had to prove that Boria (1) had knowledge of drugs, (2) had knowledge others intended to distribute drugs, or (3) purposefully intended to aid others in the specific crimes alleged. *See United States v. Cartwright,* 359 F.3d 281, 287 (3d Cir.2004). Thus, the mental state requirement for aiding and abetting is identical to that required for conspiracy, i.e. knowledge of the subject matter of the particular conduct. *Id.* Because the District Court concluded Boria lacked the requisite knowledge to support

the conspiracy conviction, the court also concluded the aiding and abetting conviction similarly lacked sufficient support.

9. Not all courts of appeals adhere to our strict approach to sufficiency in drug conspiracy cases. *Compare, e.g., United States v. Conrad,* 507 F.3d 424, 434 (6th Cir.2007) (suggesting presence and access to hidden drugs not sufficient alone to justify conspiracy conviction, though addition of co-conspirator testimony would be sufficient), *United States v. Viscarra,* 494 F.3d 490, 493–94 (5th Cir.2007) (permitting inference drugs were involved based on prior transactions, understanding of "code

*v. Cooper*, 567 F.2d 252, 254–55 (3d Cir. 1977); *United States v. Wexler*, 838 F.2d 88, 92 (3d Cir.1988); *United States v. Salmon*, 944 F.2d 1106, 1114–15 (3d Cir. 1991); *Thomas*, 114 F.3d at 406; *United States v. Idowu*, 157 F.3d 265, 270 (3d Cir.1998); *Cartwright*, 359 F.3d at 291. Despite the presence of otherwise suspicious circumstances, we have nevertheless required some additional piece of evidence imputing knowledge of drugs to the defendant.

In *Cooper*, we found the evidence insufficient because the defendant merely rode in a truck with marijuana locked in the rear compartment and there was no evidence he had access to the rear compartment. 567 F.2d at 254. We also noted the Government did not introduce any evidence of the subject matter of or participants in several phone calls to the defendant's home. *Id.* We also expressly acknowledged the lack of co-conspirator statements linking the defendant to the conspiracy. *Id.* at 255 n. 3 (indicating admission of coconspirator testimony irrelevant because there were no statements implicating defendant). Accordingly, we concluded there was no evidence the defendant knew there were drugs in the truck and no evidence of communications of a conspiratorial nature. *Id.* at 254.

In *Wexler*, the defendant served as a lookout for a drug transaction, but we concluded the evidence was insufficient to infer he knew drugs were involved. 838

F.2d at 91. There was no evidence: that the defendant knew what was in the truck (even though he admitted his alleged co-conspirators had previously conspired to import narcotics), of the subject matter of conversations between the defendant and alleged co-conspirators, or that the defendant had a prior relationship with the alleged co-conspirators. *Id.* Moreover, we determined that the inference that other co-conspirators must have trusted the defendant did not support a holding that the defendant knew drugs were involved. *Id.* at 91–92.

In *Salmon*, we again found the evidence insufficient to infer the defendant (Fitzpatrick) knew drugs were involved. 944 F.2d at 1115. Relying on our decision in *Wexler*, we found insufficient the evidence that Fitzpatrick conducted surveillance, possessed surveillance equipment at the time of his arrest, and had conversations with coconspirators. *Id.* at 1114. The Government then argued additional facts distinguished *Salmon*, including that Fitzpatrick opened a car's trunk and an alleged coconspirator approached the trunk, returning with a package of drugs. *Id.* We observed, however, there was no evidence the drugs were ever in the car and, even if they were, the drugs were wrapped in a brown paper bag and there was no evidence Fitzpatrick knew what the bag contained. *Id.* at 1114–15.

In *Thomas*, the defendant was arrested after entering a hotel room, at another's

words," and other suspicious conduct), *United States v. Isaac–Sigala*, 448 F.3d 1206, 1212 (10th Cir.2006) (permitting jury to draw inference defendant was involved in drug conspiracy rather than other illicit behavior based on conduct consistent with drug trafficking), *and United States v. Burrell*, 963 F.2d 976, 994 (7th Cir.1992) (acknowledging affirmative actions as bodyguard and lookout are sufficient to establish knowledge of drug transaction); *with, e.g., United States v. Rodriguez*, 392 F.3d 539, 545–48 (2d Cir.2004) (concluding look-

out role, conducting counter-surveillance, proximity to concealed drugs, carrying weapons to transaction, and ownership of vehicle transporting drugs insufficient to establish knowledge of drugs) *and United States v. Teffera*, 985 F.2d 1082, 1086–87 (D.C.Cir.1993) (reversing possession conviction, under aiding and abetting theory requiring specific knowledge, for lack of evidence of knowledge of drugs even though evidence supported conclusion defendant knew something criminal was afoot).

request, to confirm the presence of a suitcase and to leave the door open. 114 F.3d at 405. Another alleged co-conspirator, in cooperation with law enforcement, had left the suitcase, which contained drugs, in the hotel room. *Id.* at 404. The two alleged co-conspirators testified they did not know the defendant and had not conspired with him. *Id.* at 405. There was no evidence of a prior relationship between the defendant and the coconspirators, and no evidence regarding the substance of the phone calls, let alone that the defendant actually spoke with either of the alleged co-conspirators. *Id.* at 405–06. Thus, we concluded the evidence was not sufficient to find that the defendant knew drugs were involved. *Id.* at 406.

In *Idowu*, a man named Ajao negotiated to buy two kilograms of heroin from a DEA informant. 157 F.3d at 267. Ajao arrived at the transaction in a Lincoln Town Car driven by Idowu, whom Ajao introduced as the "driver." *Id.* Ajao then spoke to the informant in Idowu's presence, but made no reference to "heroin." *Id.* Idowu opened the trunk of the car, removed a leather bag from the trunk, and opened it to show the informant approximately $20,000 in cash, assuring him that all the money was there. *Id.* Before allowing the informant to take the bag, Idowu removed some personal documents. *Id.* Idowu then removed a black suitcase from the informant's car and placed it in the trunk of the Town Car. *Id.* Idowu opened the suitcase and, after noticing that it was empty, told Ajao that "[t]hey didn't pack this thing." *Id.* at 267–68. Ajao told Idowu to feel along the inside of the suitcase, and the informant assured Ajao and Idowu the heroin was concealed in the lining of the suitcase. *Id.* at 268. Federal agents then arrested Ajao and Idowu and recovered $3,000 cash from Idowu's person. *Id.* Following a trial, a jury convicted Idowu of conspiracy to possess with intent to distribute heroin. *Id.* at 266.

A divided panel of this Court ultimately held that "the jury could not draw a permissible inference that Idowu had knowledge of the nature of the deal," despite clear evidence showing that he knew he was involved in an illegal transaction. *Id.* at 270. We concluded "the government failed to provide evidence that Idowu knew that drugs were in fact the subject matter of the transaction." *Id.* We then overturned the conviction even though Idowu was a "trusted member" of the conspiracy and possessed the keys to his own car which contained the cash. *Id.* The dissent noted that Idowu was tacitly assigned the task of checking the informant's suitcase, an assignment which would not have been made unless he knew what he was looking for. *Id.* at 271 (Stapleton, J., dissenting). The dissent argued that this fact, in addition to the surrounding circumstances, provided sufficient evidentiary support to uphold the conviction. *Id.*

In *Cartwright*, a cooperating drug dealer set up a transaction with Jackson in a shopping center parking lot. 359 F.3d at 283–84. After the initial meeting, Jackson retreated to his car parked in another lot and returned with the drugs, accompanied by Cartwright. *Id.* at 284. There was no surveillance in the other parking lot. *Id.* Cartwright then assumed a position to serve as a lookout for the transaction. *Id.* Upon arrest, the police recovered a gun, a cell phone, a two-way text messaging device, and cash from Cartwright's person. *Id.* at 285. Based on this evidence, a divided panel concluded that although the evidence supported the inference that Cartwright served as a lookout, merely acting as a lookout is not sufficient to establish knowledge of drugs. *Id.* at 286. Further, there was no evidence of a prior relationship between Jackson and Cartwright, no evidence Cartwright was involved in prior drug transactions, and no evidence of the subject matter of communi-

cations between Jackson and Cartwright. *Id.* at 291. Therefore, we found the Government's evidence insufficient to sustain Cartwright's drug conspiracy conviction. *Id.*

The dissent argued the sequence of events in the case supported an inference of the requisite knowledge, particularly Cartwright's proximity to the drugs; his conversation with Jackson, who knowingly possessed drugs; his first appearance at the same time Jackson re-appeared with drugs; and his immediate assumption of a lookout position. *Id.* at 291–92 (Nygaard, J., dissenting).

Notably, none of these cases included co-conspirator statements implicating the defendant. *See, e.g., Idowu*, 157 F.3d at 267 (indicating co-conspirator never mentioned Idowu by name); *Cooper*, 567 F.2d at 255 n. 3 (noting Government introduced no co-conspirator statements). And although *Wexler* acknowledged co-conspirator statements, none of the statements were made to or about Wexler. *See Wexler*, 838 F.2d at 89. In other cases, there was no evidence of the participants in or the subject matter of coconspirator conversations. *E.g., Cartwright*, 359 F.3d at 291; *Thomas*, 114 F.3d at 405–06; *Salmon*, 944 F.2d at 1114.

### C.

■ The Government contends that Boria's case is distinguishable from this line of cases and, instead, is analogous to two cases in which we have found the evidence sufficient to support a permissible inference that the defendants knew drugs were involved. *See United States v. Reyeros*, 537 F.3d 270 (3d Cir.2008), *cert. denied*, —— U.S. ——, 129 S.Ct. 2780, 174 L.Ed.2d 273 (2009); *United States v. Iafelice*, 978 F.2d 92 (3d Cir.1992).

In *Iafelice*, an undercover DEA agent negotiated to purchase heroin from John Sinde and his brother at a hotel. 978 F.2d at 94. Agents conducting surveillance of the transaction site observed a white Cadillac, which Iafelice stipulated he owned, pull into the parking lot. *Id.* Iafelice then engaged in counter-surveillance movements while in the vehicle. *Id.* Three individuals exited the car (Iafelice, Sinde, and Thomas Finn), but only Sinde entered the transaction site; Iafelice and Finn got back into the Cadillac with Iafelice in the driver's seat. *Id.* When Sinde returned, Iafelice opened the car's trunk from the inside and Sinde removed a brown camera bag. *Id.* It was later discovered that the bag contained heroin in a clear plastic bag. *Id.* Sinde then returned to the hotel, met his brother inside, and waited for the undercover agent to arrive to complete the sale. *Id.* During the transaction, Sinde's brother's beeper went off and the number was traced back to Finn's phone in Iafelice's car. *Id.* The Sindes used the agent's mobile phone to return the call. *Id.* An agent watching the Cadillac saw Iafelice reach down and answer the car phone. *Id.* Although Iafelice was acquitted of conspiracy and convicted of possession, *id.* at 95, our analysis still turned on Iafelice's knowledge under a constructive possession theory, *id.* at 96.

In upholding the jury's verdict, we noted the surrounding circumstances, such as Iafelice's suspicious driving, his co-conspirators' conduct, the fact that the trunk of the car (which contained the drugs) was opened from the inside of the car, and that during the transaction a page was sent from a phone in Iafelice's car to which Iafelice received a return call. *Id.* at 97. But we determined that the "truly distinguishing fact [was] Iafelice's ownership and operation of the vehicle used to transport the drugs" because it provided "the essential additional evidence necessary to distinguish" *Iafelice* from preceding cases finding insufficient evidence of knowledge. *Id.* From this additional fact, we concluded

"[c]ommon sense counsels that an owner and operator of a vehicle ... usually knows what is in that vehicle." *Id.*

In *Reyeros,* Juan and Jorge Reyeros negotiated with multiple individuals to import cocaine into the United States. 537 F.3d at 275–77. One of those individuals, however, was a DEA and U.S. Customs Service informant. *Id.* at 275. The informant's role was to identify an American company through which the group could import the drugs. *Id.* Juan told the other members of the conspiracy that his brother, Jorge, was a customs inspector and would facilitate the importation. *Id.* at 276. According to Juan, the shipment would have to be large enough to make it worth the risk to Jorge's career. *Id.*

We concluded that a co-conspirator's testimony of Juan's statements about Jorge's role and statements was sufficient to enable a rational juror to conclude beyond a reasonable doubt that Jorge knew the purpose of the conspiracy was to import cocaine. *Id.* at 279. We further noted additional pieces of evidence "buttress[ed] the direct statement of knowledge attributed to Jorge by his brother Juan," such as Jorge would be likely to ask Juan the nature of the transaction because of their familial relationship, the risk to Jorge's career, and Jorge's expected receipt of a percentage of the value of any cocaine imported. *Id.* at 279 n. 12.

Although factually distinct from *Iafelice* and *Reyeros,* the case before us does have additional facts imputing knowledge of drugs. We reach this conclusion after considering the suspicious circumstances of this case, including that Boria met co-conspirators Diaz and Alvarado early in the morning after only a few hours of sleep, Boria did not hesitate in approaching the tractor-trailer containing the cocaine and then approaching the vehicle Alvarado was driving, Boria confirmed his identity and that Morel had sent him, and Boria intended to and began to direct Diaz and the tractor-trailer with the cocaine to a garage in North Philadelphia.

The "truly distinguishing fact," *Iafelice,* 978 F.2d at 97, however, is Alvarado's testimony that Boria's role was to "take [the tractor-trailer] to a garage to unload the drugs that were in the back of the tractor-trailer." (App.139.) Alvarado reiterated Boria's role on cross-examination, testifying that, according to Morel, Boria was responsible for "taking the truck from [his] hands to take it to another garage to unload it," (*id.* 144), and for "tak[ing] the driver of the tractor-trailer to finish off what needs to be done inside the truck," (*id.* 145). Although Boria never accessed the trailer, this co-conspirator testimony imputes to Boria knowledge that the tractor-trailer he was assigned to direct to a garage contained drugs, which is the additional fact necessary to support the jury's guilty verdict. The cases in which we declined to find sufficient evidence did not include such evidence, and we find its presence in this case decisive. *See also Reyeros,* 537 F.3d at 279 (relying on co-conspirator testimony implicating defendant to sustain conviction).[10]

A rational trier of fact could infer that Boria knew drugs were involved based on Alvarado's testimony and the suspicious circumstances under which Boria became associated with the tractor-trailer. Boria was responsible for taking the truck for

---

10. Although the *Reyeros* co-conspirator testimony relayed a statement allegedly made by the defendant himself, *see* 537 F.3d at 275–76, we conclude it is appropriate to attribute Morel's statement regarding Boria's role to the defendant in this case, *see United States v.* *Pecora,* 798 F.2d 614, 628 (3d Cir.1986) (noting legal fiction that "each conspirator is an agent of the other and ... statements of one can therefore be attributable to all") (citation omitted). Boria has not challenged the admission of Alvarado's testimony.

unloading, but first had to arrange a garage. He knew exactly which truck to approach, confirmed Morel had sent him, and began directing the truck to a garage. A reasonable juror could conclude, based on this arrangement, that Boria knew something criminal was afoot. Alvarado's testimony that Boria was responsible for unloading the drugs, attributable to Boria as a co-conspirator, then serves as the crucial additional fact imputing knowledge of drugs, as opposed to some other form of contraband. Accordingly, a rational trier of fact could have found Boria guilty, beyond a reasonable doubt, of conspiracy to possess with intent to distribute cocaine and aiding and abetting the possession of cocaine.

## IV.

We conclude that the evidence presented at trial could lead a rational trier of fact to find Boria knew a controlled substance was involved in the transaction, particularly his co-conspirator's statement regarding his role.

The District Court was required to review the record in the light most favorable to the Government and should not have overturned the verdict. Under this particularly deferential standard of review, we reverse the District Court's encroachment on the jury's role and remand this matter for further proceedings consistent with this opinion.

FISHER, Circuit Judge, concurring.

I agree with the majority that co-conspirator Alvarado's testimony imputes to Boria knowledge that the tractor-trailer driven by Diaz contained drugs, and thus that a rational jury could find beyond a reasonable doubt that Boria knew he was transporting a controlled substance, as opposed to some other form of contraband. I write separately for the reasons stated herein.

In reviewing a challenge to the sufficiency of the evidence, "we must view the evidence in the light most favorable to the Government and sustain the verdict if any rational juror could have found the elements of the crime beyond a reasonable doubt." *United States v. Reyeros,* 537 F.3d 270, 277 (3d Cir.2008) (quotations, alteration, and citation omitted). In doing so, we must remember that "we do not view the government's evidence in isolation, but rather, in conjunction and as a whole." *United States v. Brodie,* 403 F.3d 123, 134 (3d Cir.2005).

Taken as a whole, the facts stated by the majority allow a rational jury to make several alternative inferences. One rational inference is that Boria was hired by Morel to direct Diaz and the tractor-trailer to a garage and unload, not just boxes of rotten fruit, but what Boria knew to be drugs. Because we must view the evidence in the light most favorable to the Government, *Reyeros,* 537 F.3d at 277, the fact that alternative inferences exist is irrelevant. *See United States v. Iafelice,* 978 F.2d 92, 97 n. 3 (3d Cir.1992) ("There is no requirement ... that the inference drawn by the jury be the only inference possible or that the government's evidence foreclose every possible innocent explanation."). Therefore, even though the jury could have also rationally inferred, among other things, that Boria was employed to direct the tractor-trailer to a garage and unload its contents without knowing the exact nature of the load, this did not entitle the District Court to overturn the jury's guilty verdict.

Agreeing with the majority's final holding, I write this concurrence to highlight the tension between this opinion and some of our most recent case law. We have stated the standard of review in conspiracy cases to be as follows: "In order for us to sustain a defendant's conviction for con-

spiracy, the government must have put forth evidence tending to prove that defendant entered into an agreement and knew that the agreement had the specific unlawful purpose charged in the indictment." *United States v. Cartwright*, 359 F.3d 281, 286–87 (3d Cir.2004) (quoting *United States v. Idowu*, 157 F.3d 265, 268 (3d Cir.1998)) (additional quotations and citations omitted). " 'The elements of a conspiracy may be proven entirely by circumstantial evidence.' " *Id.* at 286 (quoting *United States v. Wexler*, 838 F.2d 88, 90 (3d Cir.1988)). In "[a]pplying this rule, '[w]e have consistently held in cases of this genre that, even in situations where the defendant knew that he was engaged in illicit activity, and knew that "some form of contraband" was involved in the scheme in which he was participating, the government is obliged to prove beyond a reasonable doubt that the defendant had knowledge of the particular illegal objective contemplated by the conspiracy.' " *Id.* at 287 (quoting *Idowu*, 157 F.3d at 266–67) (additional citations omitted). Therefore, "the proper question before us with respect to both the conspiracy and the aiding and abetting charges is 'whether there was sufficient evidence that [Boria] knew that the subject matter of the transaction was a controlled substance, rather than some other form of contraband, such as stolen jewels or computer chips or currency.' " *Id.* (quoting *Idowu*, 157 F.3d at 266).[11]

The tension lies in the different legal conclusions this Court has drawn based on differing sets of facts. The majority groups this case with *Reyeros* and *Iafelice* due to the "suspicious circumstances of this case" and, more importantly, co-conspirator Alvarado's testimony that Boria's role was to "take the tractor-trailer . . . to

a garage to unload the drugs that were in the back of the tractor-trailer." (App.139.) While I agree that the unique presence of coconspirator testimony, which is absent from this Court's prior decisions in this area, sufficiently imputes knowledge to Boria, I view this case to be distinguishable from *Reyeros* and *Iafelice*. In addition, I believe that the outcome of this case conflicts with the spirit of our prior decision in *Idowu*.

*Iafelice* was a possession case. Accordingly, our inquiry in *Iafelice* was "whether there was sufficient evidence to conclude that [the defendant] had constructive possession of the drugs, and whether he had an intent to distribute those drugs." 978 F.2d at 96. We stated that "[c]onstructive possession exists if an individual 'knowingly has both the power and the intention at a given time to exercise dominion or control over a thing, either directly or through another person or persons.' " *Id.* (quoting *United States v. Blackston*, 940 F.2d 877, 883 (3d Cir.1991)). In distinguishing the case from *Wexler* and *Salmon*, we concluded that the "truly distinguishing fact" was the defendant's ownership and operation of the vehicle transporting the drugs: "[o]wnership and operation of the car are highly relevant facts that could reasonably have been considered by a jury in evaluating [the defendant's] knowledge of, and dominion and control over, the drugs." *Id.* at 96–97. Boria, in contrast, was convicted of conspiracy to possess with intent to distribute, and aiding and abetting the possession with intent to distribute, cocaine. Accordingly, our focus here is not whether Boria had "dominion or control" over the drugs, but rather whether Boria "entered into an agreement and knew that the agreement had the specific unlawful pur-

---

**11.** As the majority explains in footnote 8, the standard is the same for Boria's aiding and abetting conviction.

pose charged in the indictment." *Cartwright*, 359 F.3d at 287 (quoting *Idowu*, 157 F.3d at 268) (additional quotations and citations omitted). Therefore, because the nature of the inquiry is different, Boria's control over the tractor-trailer here, while relevant, is arguably not as dispositive as the defendant's ownership and operation of the vehicle in *Iafelice*.

Although a conspiracy case, *Reyeros* is also distinct. Like the instant case, our holding in *Reyeros* relied primarily on co-conspirator testimony. 537 F.3d at 279. However, as the majority acknowledges in footnote 10, the *Reyeros* coconspirator testified to a statement allegedly made by the defendant himself, whereas here Alvarado only testified to his own understanding of Boria's role in the conspiracy. *Id.* Furthermore, the *Reyeros* court cited additional evidence from which the jury could have reasonably inferred that the defendant had knowledge of the subject matter of the transaction: the defendant had a familial relationship with a co-conspirator and there was evidence that the defendant would be paid a percentage of the value of the cocaine imported. *Id.* at 279 n. 12. The Government presented no analogous evidence against Boria.

Of course, the fact that *Iafelice* and *Reyeros* are distinguishable by no means invalidates the majority's holding, with which I agree. The majority cites additional circumstantial evidence not present in *Iafelice* or *Reyeros*, namely, Boria's suspicious behavior in the early morning hours of February 6, 2007, that I believe enables the Government to make its case.

Our prior decision in *Idowu* creates an even greater incongruity. Although we held in *Idowu* that the evidence was insufficient to show that the defendant knew that the subject matter of the transaction was a controlled substance, 157 F.3d at 270, it seems that the Government's case against the *Idowu* defendant was altogether stronger than the Government's case against Boria here: unlike Boria, the *Idowu* defendant had a preexisting relationship with the co-conspirator; drove the co-conspirator to the transaction; was present in the vehicle when the co-conspirator invited the informant to enter the car to discuss the transaction (the informant declined); counted the money for the transaction; carried the money for the transaction in his bag; and searched the informant's suitcase for the contraband, remarking, "They didn't pack this thing." *Id.* at 267–68. Boria, in contrast, had thus far only begun to direct a tractor-trailer to a garage, where he would presumably unload the trailer, when he was apprehended. Therefore, although the different facts clearly allow for different conclusions, I view *Idowu* and this opinion to be, in a broader sense, incompatible.[12]

In summary, I agree with the majority that, viewing the evidence in the light most favorable to the Government, co-conspirator Alvarado's testimony allows a rational jury to find beyond a reasonable doubt that Boria knew he was transporting a controlled substance, as opposed to some other form of contraband. I write sepa-

---

**12.** The inconsistencies may stem from our circuit's seemingly paradoxical standard of review. Although we acknowledge that "[t]he elements of a conspiracy may be proven entirely by circumstantial evidence," *Cartwright*, 359 F.3d at 286 (quoting *Wexler*, 838 F.2d at 90), we require that there be "sufficient evidence that [the defendant] knew that the subject matter of the transaction was a controlled substance, rather than some other form of contraband," *id.* at 287 (quoting *Idowu*, 157 F.3d at 266). It may be that the difficulty of producing evidence that the defendant knew that the subject matter was a controlled substance has turned our standard of review, not in name but in application, into a requirement for direct evidence.

rately solely to highlight the tension between this opinion and our prior case law.