**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-1080
_____

UNITED STATES OF AMERICA

v.

JUAN CORDERO,

Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(District Court No.:  2-08-cr-00328-001)
District Judge:  Honorable Cynthia M. Rufe

_____

Submitted under Third Circuit LAR 34.1(a)
on March 5, 2013

(Filed: August 19, 2013)

Before:  RENDELL, AMBRO and VANASKIE, Circuit Judges

_____

O P I N I O N
_____

**RENDELL**, Circuit Judge:

Appellant Juan Cordero was convicted by a jury of all charges arising out of a

conspiracy to import cocaine into the United States.  Cordero filed a motion for judgment

of acquittal, arguing that the government did not present sufficient evidence from which a jury could properly conclude that he knew the specific objective of the unlawful conspiracy, namely, a controlled substance. The District Court denied Cordero's motion. His timely appeal is currently before the Court.

For the reasons stated below, we will affirm the District Court's Order.

## I. Background[1]

On May 1, 2008, two men—Luis Deya-Diaz and Richard Caraballo-Rodriguez— triggered the suspicion of the Drug Enforcement Agency ("DEA") when they purchased last-minute one-way airplane tickets from San Juan, Puerto Rico to Philadelphia International Airport and checked no luggage. (Supp. App. 191-92.) As a result, DEA agents in Philadelphia organized a surveillance team at the airport. (*Id.*)

Despite not having checked baggage, Deya-Diaz and Caraballo-Rodriguez proceeded to the baggage claim after deplaning. (*Id.* at 193-94.) Cordero met them there. (*Id.* at 195.) After Deya-Diaz retrieved two suitcases from the baggage carousel, Cordero led him out of the terminal and into the parking garage. (*Id.* at 163-65; 196-98.) Cordero instructed Deya-Diaz to put the suitcases in a Suburban and to get in a minivan parked nearby. (*Id.* at 202-05.) Caraballo-Rodriguez joined the men in the parking lot, put the two suitcases he picked up from the baggage carousel in the Suburban and joined Deya-Diaz in the minivan. (*Id.*) Both the minivan and Suburban then left the parking

---

[1] The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. We have appellate jurisdiction pursuant to 28 U.S.C.§ 1291.

2

garage—Cordero drove the minivan southbound on I-95 and another man, named Wilfredo Aquino, drove the Suburban northbound on I-95. (*Id.*)

Aquino was pulled over in the Suburban shortly after leaving the parking garage. (*Id.* at 207.) A search of the vehicle subsequently revealed that the four suitcases that Deya-Diaz and Caraballo-Rodriguez put into the trunk contained nearly fifty kilograms of cocaine. (*Id.* at 125, 131.) Meanwhile, state troopers observed the minivan driven by Cordero swerve between lanes and take evasive actions. (*Id.* at 148.) The minivan was pulled over, and Cordero, Deya-Diaz, and Caraballo-Rodriguez were taken into custody. (*Id.* at 152.)

A grand jury in the Eastern District of Pennsylvania returned an indictment charging Caraballo-Rodriguez, Cordero, and Deya-Diaz with conspiring to distribute cocaine, in violation of 21 U.S.C. § 846, possession of cocaine with the intent to distribute, and aiding and abetting possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1), and 18 U.S.C. § 2. Deya-Diaz subsequently entered a guilty plea and testified against Caraballo-Rodriguez and Cordero, who both proceeded to trial and were tried jointly.

According to Deya-Diaz, on April 25, 2008, an unidentified Dominican male known to Deya-Diaz as "Domi" called him and offered him $5,000 to fly to from Puerto Rico to Philadelphia and pick up two suitcases at the Philadelphia airport. (*Id.* at 314-17.) Domi told Deya-Diaz that someone would recognize him at the airport and take him to the parking garage, where Deya-Diaz would turn over the suitcases. (*Id.* at 317-18.) Before the flight, Deya-Diaz met Domi in Puerto Rico, and Domi repaid Deya-Diaz for

3

the plane tickets, showed him the suitcases he was to retrieve in Philadelphia, asked Deya-Diaz to describe what he would wear at the airport, and told Deya-Diaz that he would be paid $5,000 when he arrived in New York, after being driven from the Philadelphia airport. (*Id.* at 314-18.) Deya-Diaz also testified that no one told him that there were drugs in the suitcases, and that he did not know that any other courier would be on the flight. (*Id.* at 312; 330.)

Deya-Diaz further testified that during the ride he asked Cordero where they were going; Cordero responded that they were going to the Bronx, and that Deya-Diaz would be paid there. (*Id.* at 333.) According to Deya-Diaz, when Cordero realized that they were being followed by a patrol car, Cordero instructed Deya-Diaz and Caraballo-Rodriguez to remove the chips from their cell phones. Cordero threw the chip from his cell phone out the driver's side window. (*Id.* at 335-36.)

The government also introduced expert testimony from a state narcotics agent, Alan Basewitz. Agent Basewitz testified that the case involved numerous indicia of organized drug trafficking. Agent Basewitz described the role of a "monitor" in drug trafficking organizations:

> A:     [Because] you're usually dealing with very high level amounts, there is somebody from the organization sent to insure that the police haven't interceded, that the person is doing what they're supposed to do and not, for instance, taking the drugs for themselves.
>
>     So they're basically observing. However, the monitor or observer is not somebody who is going to touch the drugs. It's very difficult to associate them. Usually, you're watching for observation because they don't want to touch the drugs because that links them to the drugs.

4

> So the courier is designed to take them one leg to another. A monitor is observing to make sure they're not doing anything that they shouldn't be doing.
>
> Q: And does the monitor or the observer also insure that the drugs get to where they're supposed to go?
>
> A: That's exactly what their role is. And . . .
>
> Q: How do they do that?
>
> A: They do that by sometimes directing, for instance, where the bag should be taken, who the individual or individuals that are going to receive the bags from the courier, who they are.

(*Id.* at 616-17.)

After a five-day trial, the District Court instructed the jury—including a willful blindness instruction at the government's request—and gave the jury its charge. On July 6, 2009, the jury returned a verdict convicting both Cordero and Caraballo-Rodriguez of all charges. Thereafter, Cordero and Caraballo-Rodriguez filed a joint post-trial motion for acquittal, which the District Court denied as to Cordero on September 7, 2011. The District Court held that "[a]lthough this is admittedly a close case, we conclude that the Government's evidence against Cordero was sufficient to support the jury's verdict." (App. 49.)[2]

Cordero's timely appeal followed.

---

[2] The District Court granted the motion as to Caraballo-Rodriguez. We address the government's appeal of the District Court's judgment of acquittal in a separate opinion.

## II. Standard

We exercise plenary review over an appeal from the grant of a judgment of acquittal, and independently apply the same standard the district court uses in deciding the motion. *See United States v. Boria*, 592 F.3d 476, 480 (3d Cir. 2010).

We recently considered the standard to apply in reviewing sufficiency of the evidence claims in drug conspiracy cases in the appeal filed by Caraballo-Rodriguez, Cordero's co-defendant. *United States v. Caraballo-Rodriguez*, --- F.3d ---, 2013 WL 4017157 (3d Cir. 2013). We noted that "the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction . . . is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (emphasis in original). We also noted that we have not always applied that deferential standard in our prior cases, and reiterated the appropriate standard to apply in reviewing a sufficiency of the evidence challenge in drug conspiracy cases: "[t]he district court—and we—are not to act as a thirteenth juror. Instead, the jury's verdict must be assessed from the perspective of a reasonable juror, and the verdict must be upheld as long as it does not 'fall below the threshold of bare rationality.'" *Caraballo-Rodriguez*, 2013 WL 4017157, at *12 (quoting *Coleman v. Johnson*, 132 S. Ct. 2060, 2065 (2012)).

## III. Discussion

Looking at the evidence in the light most favorable to the government, it is clear that the jury could have reasonably concluded that Cordero knew that he was involved in

an illegal venture, and that he knew that the object of that venture was a controlled substance.

To prove a conspiracy, the government must show: (1) a shared unity of purpose; (2) an intent to achieve a common illegal goal; and (3) an agreement to work toward that goal. *Boria*, 592 F.3d at 481 (citing *United States v. Mastrangelo*, 172 F.3d 288, 291 (3d Cir. 1999)). The government must establish each element beyond a reasonable doubt. *United States v. Coleman*, 811 F.2d 804, 808 (3d Cir. 1987). It may do so with direct or circumstantial evidence. *United States v. Brodie*, 403 F.3d 123, 134 (3d Cir. 2005). When considering drug conspiracy cases over the past several decades, we have viewed the second element—"illegal goal"—as requiring proof that the defendant had knowledge of the specific objective contemplated by the particular conspiracy. *Id.* at 287. As mentioned above, "knowledge" can be demonstrated by actual knowledge or willful blindness. *See Brodie*, 403 F.3d at 148 ("The knowledge element . . . may be satisfied upon a showing beyond a reasonable doubt that a defendant had actual knowledge or deliberately closed his eyes to what otherwise would have been obvious to him concerning the fact in question." (internal quotation marks and citations omitted)).

As the District Court observed, the evidence introduced at trial established that

> Cordero identified the couriers at the Philadelphia airport, although he had
> never met them before, guided them to the SUV, and showed them where
> to put the suitcases. He used his own car to transport the couriers from the
> airport. When he noticed the police were following him, he took evasive
> measures and attempted to destroy evidence by discarding the SIM card in
> his phone. And when Deya asked where he would be paid, Cordero
> informed him that he would receive payment in the Bronx. . . . Finally, the
> Government introduced Basewitz's expert testimony, which . . . was

7

confined to a general description of the typical role of monitors in Puerto-Rican drug trafficking schemes.

(App. 45-46.)  This evidence, taken as a whole, supports a "permissible inference that Cordero was in a position of leadership and control in the drug smuggling scheme . . . . [which], in turn, could support a reasonable juror's conclusion that Cordero knew that the object of the scheme was to distribute narcotics." (*Id.* at 47.)

Having reviewed the record ourselves, we agree with the District Court's assessment of the evidence.  Further, we agree with the District Court that a rational trier of fact could have found the essential elements of the crime, including knowledge of the object of the conspiracy, beyond a reasonable doubt.  Indeed, the evidence introduced at trial forms a sufficient basis from which the jury could infer knowledge or willful blindness.

## IV.  Conclusion

For the reasons stated above, we will affirm the Order of the District Court.

8