**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-4439
_____

UNITED STATES OF AMERICA

v.

RASHAAN BATES,
Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2:09-cr-00033-001)
District Judge: Honorable Anita B. Brody

_____

Argued December 6, 2011

Before: HARDIMAN, BARRY, and VAN ANTWERPEN, Circuit Judges

(Filed February 24, 2012)

Leigh M. Skipper, Esq.
Robert Epstein, Esq. [**ARGUED**]
David L. McColgin, Esq.
Federal Community Defender Office For the Eastern District of Pennsylvania
Suite 540 West - Curtis Center
601 Walnut Street,
Philadelphia, Pennsylvania 19106
        *Counsel for Appellant*

Zane David Memeger, Esq.
Robert A. Zauzmer, Esq.
Emily McKillip, Esq. [**ARGUED**]
United States Attorney's Office
615 Chestnut Street

Suite 1250
Philadelphia, PA 19106
      *Counsel for Appellee*

———

OPINION OF THE COURT

———

VAN ANTWERPEN, *Circuit Judge*.

A federal grand jury returned a four-count indictment against Defendant-Appellant Rashaan Bates ("Bates"). A jury found Bates guilty on three of the four counts. Bates appeals his conviction only as to count I, possession with intent to distribute 100 grams or more of heroin in violation of 21 U.S.C. §§ 841(a)(1). The District Court denied Bates's motion for judgment of acquittal because it found the facts were distinguishable from this Court's prior decisions regarding constructive possession, namely *United States v. Brown*, 3 F.3d 673 (3d Cir. 1993) and *United States v. Jenkins*, 90 F.3d 814 (3d Cir. 1996).

Wholly apart from the fact that the District Court improperly distinguished *Brown* and *Jenkins*, there is virtually nothing in this record that even suggests that Bates constructively possessed the heroin, and the District Court erred in concluding otherwise. In broad summary, Bates was seen on but one occasion exiting the house where he had, until recently, lived and to which he still had a key. He then crossed the street and shortly thereafter sold a few packets of crack cocaine, leaving that location a few minutes later and returning to it the following day, when he was arrested. Nothing connects Bates or the packets of crack cocaine he was selling to the heroin or heroin paraphernalia or

2

anything else found in the house. We will, therefore, reverse his conviction on Count I, vacate the sentence, and remand for resentencing.

## I. Facts

Officers Richard Woertz and Brian Myers of the Philadelphia Police Department ("PPD") met with a registered confidential informant ("CI") at a staging area on October 7, 2008. The officers instructed the CI to attempt to purchase drugs on the 1400 block of Lardner Street. The CI met Woertz just north of Lardner Street and he was given pre-recorded buy money. A third PPD officer, Harold Toomer, conducted surveillance of the area that evening by sitting in a vehicle further down the block. Toomer saw Bates exit a residence at 1474 Lardner Street, cross the street, and sit on the steps of 1471 Lardner Street. Shortly thereafter Toomer witnessed the CI walking down Lardner Street. The CI stopped to talk to Bates on the steps of 1471 Lardner Street. Toomer saw an exchange between the CI and Bates, where the CI gave Bates cash, and Bates gave the CI an object from his coat pocket. Toomer testified that Bates left the area a short time after the CI left. The CI then returned to the staging area where he gave Woertz a red plastic packet that contained crack cocaine.

The next day, October 8, 2008, fourteen PPD officers, including Myers and Toomer, went to execute a search warrant on 1474 Lardner Street. Toomer again saw Bates sitting on the steps of 1471 Lardner Street, this time with another individual, and recognized Bates as the person that sold drugs to the CI the previous day. Toomer and another officer, Marshall Kelly, approached the two men and searched them. Toomer's frisk of Bates revealed an Intratec 9mm firearm, which Toomer secured. Kelly

3

proceeded to search Bates and discovered twelve blue packets of crack cocaine in a clear plastic bag. Bates had no money on his person. In addition to the twelve packets of cocaine, the officers found a key on Bates. The officers tested the key on 1474 Lardner Street and it operated the lock.

The house located at 1474 Lardner Street was vacant at the time of the officers' search, but Myers found over 100 grams of heroin, as well as heroin paraphernalia, in a bedroom on the second floor. Some of the heroin was in bulk form, while the rest was in 360 white glassine packets stamped "Chicago." The heroin paraphernalia included grinders, a scale, a spoon, a strainer, and a credit card with the name "Yajaira Batista." The credit card was covered in heroin residue. The officers discovered a tally book inside the residence, and the words and names in the tally book were largely in Spanish. Myers also found unused blue, white, and clear glassine packets, which were different than the blue packets found on Bates. Bates's fingerprints were not found in the room containing the drugs, no evidence placed him in the bedroom containing the drugs, he had no heroin on his person, and no heroin residue was found on his clothes or person.

Subsequent investigation revealed that Bates's driver's license identified 1474 Lardner Street as his place of residence. Bates's mother testified that she and Bates had lived in the house at 1474 Lardner Street between August 2007 and September 2008. The property manager for 1474 Lardner Street testified that, to the best of his knowledge, the building was vacant on the day Bates was arrested, October 8, 2008, and had no legal tenants, although tenants were scheduled to move in on November 1, 2008. In the middle of September, after Bates and his mother moved out, the property manager checked 1474

4

Lardner Street and found it "empty." At that time the building contained no furniture, trash, or personal possessions.

Bates was charged by a grand jury with four counts: (I) possession with intent to distribute 100 grams or more of heroin in violation of 21 U.S.C. § 841(a)(1); (II) possession with intent to distribute cocaine base in violation of 21 U.S.C. § 841(a)(1); (III) distribution of cocaine base in violation of 21 U.S.C. § 841(a)(1); and (IV) possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1).

At trial, the Government called PPD Detective Andrew Callaghan as an expert witness. Callaghan gave his opinion regarding the evidence recovered from 1474 Lardner Street. Callaghan testified that the street value of the heroin seized was over $200,000 and that, in his experience, such a large amount of heroin is kept in a secure location to prevent it from being either detected by law enforcement, or stolen by other individuals. Similarly, such a large volume of heroin led Callaghan to believe an organization involving more than one person was trafficking the drug. Callaghan also testified that members of drug organizations usually do not conduct sales out of locations where they store their drugs because it could draw the attention of law enforcement, as well as "street thugs" looking to steal the stored drugs.

The jury convicted Bates on counts I, II and IV, but acquitted him on count III. Count III was the charge of distribution of crack, arising from the sale to the CI on October 7, 2008. After the trial, Bates filed a motion for judgment of acquittal under Fed. R. Crim. P. 29, which was denied by the District Court. Bates filed a timely notice of

5

appeal, seeking review only of the District Court's denial of the motion for judgment of acquittal regarding count I.

## II. Jurisdiction

The District Court had jurisdiction under 18 U.S.C. § 3231. We have appellate jurisdiction under 28 U.S.C. § 1291.

## III. Standard of Review

In reviewing a motion for judgment of acquittal made pursuant to Fed. R. Crim. P. 29, a district court must "'review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence.'" *United States v. Smith*, 294 F.3d 473, 476 (3d Cir. 2002) (quoting *United States v. Wolfe*, 245 F.3d 257, 262 (3d Cir. 2001)). Thus, a verdict will be sustained "if there is substantial evidence to uphold the jury's decision." *United States v. Boria*, 592 F.3d 476, 480 (3d Cir. 2010). This is a "particularly deferential standard of review" and reviewing courts "must be ever vigilant . . . not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting [the court's] judgment for that of the jury." *Id.* (alteration and omission in original) (quoting *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005)). On appeal this court exercises plenary review and applies the same standard a district court would use in deciding the motion. *Id.*

## IV. Discussion

The two prior decisions of this Court on point are *United States v. Brown*, 3 F.3d 673 (3d Cir. 1993) and *United States v. Jenkins*, 90 F.3d 814 (3d Cir. 1996). The District

6

Court relied on these decisions in formulating its opinion, and the parties rely upon them in this appeal.

## A. *United States v. Brown*

In *Brown*, this Court reversed the district court's order denying the defendant's motion for judgment of acquittal. Defendant Ama Baltimore, along with two others, was charged and convicted on four counts relating to possessing drugs with the intent to distribute. *Brown*, 3 F.3d at 675–76. The police were acting on a tip that drugs were located at Brown's residence, and they were searching the home for drugs when Baltimore arrived at the home. *Id*. at 675. Baltimore was in the process of opening the front door with her key to the residence when she was arrested. *Id*. The police brought Baltimore inside and questioned her regarding a pair of shorts found in an upstairs sewing room. *Id*. Baltimore admitted the shorts were hers, and when the police removed a switchblade knife from the pocket of the shorts, she also admitted the knife was hers. *Id*. Then Baltimore stated "but you can't arrest me because I am in my own house." *Id*. Heroin, crack, and cocaine were discovered throughout the house, in areas that included the kitchen and the bedrooms, but not the sewing room where Baltimore's shorts were discovered. *Id*.

To demonstrate Baltimore's constructive possession of the drugs, the Government focused on her possession of a key to the house, her attempted entry using the key, the presence of her shorts and switchblade within the house, her statement that she was in her "own house," and the fact that the house was a "cut house" where large quantities of drugs were cut and distributed. *Id*. at 680–81. Baltimore responded that there was no

evidence of her fingerprints on any of the drugs, that her possessions (the shorts and switchblade) were in a room in which no drugs were found, that she was arrested before entering the house, and that Brown was the sole owner of the property. *Id*. at 681 We concluded "while the evidence may be sufficient to show that Baltimore was residing at the Brown home and that she knew that drugs were in the house, the evidence is not sufficient to support a finding that she exercised dominion and control over the drugs." *Id.* at 681.

Importantly, this Court rejected the Government's contention that the Eighth Circuit's decision in *United States v. Brett*, 872 F.2d 1365 (8th Cir. 1989), controlled the case. In *Brett*, the Eighth Circuit affirmed the defendant's conviction for possessing cocaine with intent to distribute. The police obtained a search warrant for the house after an undercover officer purchased crack from individuals at the house. *Brett*, 872 F.2d at 1367. As officers approached, the appellant ran from the house and was apprehended. He was arrested along with two individuals who remained inside. *Id*. at 1367–68. The man who ran from the house had nearly four thousand dollars and a key that opened the lock on the house on his person. *Id*. The police uncovered drugs in what the court called a "fortified drug house"—a house containing no refrigerator, stove, food, or clothing, but with windows and doors reinforced with wood, metal brackets, and extra locks. *Id*. at 1368. The Eighth Circuit affirmed the conviction of the defendant who possessed the key to the house concluding that "possession of the key to the front door of the house is sufficient evidence to prove the 'knowing possession' element [of the drug charge]." *Id*. at 1369.

In *Brown*, this Court did not apply *Brett* because "[p]ossession of the key to the crack house would indicate a much greater likelihood that the defendant was involved with the drugs found therein than Baltimore's possession of a key to Brown's home, which was used not only for drug-related activity but also a residence." *Brown*, 3 F.3d at 683–84. This Court further distinguished *Brett*, because the circumstances underlying the arrest in *Brett* were far more inculpatory than the circumstances in *Brown*. *See id.* at 684 ("[T]he appellant in *Brett* was found fleeing from the crack house when the police arrived; he falsely identified himself at the time of arrest; and he was found at the time of his arrest with $3,746 in cash in his possession, but would not explain how he had obtained the money. In short, his possession of the key to the house was only one among a number of factors all of which supported the conclusion that he knew about and had dominion and control over the drugs found in the crack house." (citations omitted)). Unlike *Brett*, therefore, we found that "even if [Baltimore] knew that the drugs were in the house, the evidence [did] not support a finding that she had dominion and control over th[e] drugs." *Id.* at 682. Therefore we found insufficient evidence to support the jury's finding that Baltimore possessed the drugs, and, accordingly, overturned her conviction on the count.

### B. *United States v. Jenkins*

In *Jenkins*, this Court also reversed the district court's order denying the defendant's motion for judgment of acquittal. There, Philadelphia police officers responded to a call that gunshots were fired near an apartment building. *Jenkins*, 90 F.3d at 816. The police pursued the suspect through the building into an apartment, and when

they entered the apartment found two men, one of whom was Jenkins, seated on a couch. *Id*. The two men, who were wearing only boxer shorts and t-shirts, were seated behind a coffee table with "three bags of white powder containing a total of 55.3 grams of cocaine and 42 grams of non-cocaine white powder, two triple-beam scales, two loaded .38 caliber revolvers, small ziplock-style bags, clear plastic vials, and numerous red caps." *Id*.

No evidence was provided that either man had worked with the cocaine, as no residue was found on them or the scales, and neither man tried to destroy any of the contraband in the room. *Id*. at 816–17. Jenkins was not a resident of the apartment, but was described by the manager of the apartment building as someone who was "in and out" of the apartment. *Id*. Jenkins was charged and convicted for possessing cocaine with intent to distribute. *Id*. at 817. His motion for judgment of acquittal was denied. *Id*.

Jenkins appealed, and the issue before this Court was whether sufficient evidence existed to establish constructive possession. *Id*. This Court, relying on *Brown*, held sufficient evidence did not exist. Although the Government argued that *Brown* was distinguishable on the grounds that the defendant's shorts were not found in the same room as the drugs whereas Jenkins was found directly next to the drugs, we rejected this argument. As we stated, "[i]t is a serious misreading of [*Brown*] to conclude that the degree of proximity of [the defendant] or her clothing to the drugs was a controlling factor." *Id*. at 819. Expanding on a point not discussed in *Brown*, this Court stated that because the defendant, Ama Baltimore, lived in the house it was "virtually certain that she regularly would have entered the kitchen and bedroom, the rooms in which the drugs

10

were found." *Id.* Yet, because residence in the house is itself insufficient to prove dominion and control over the drugs, the visits to the rooms did not matter as long as they did not pertain to the drugs. *Id.*

Accordingly, we held in *Jenkins* that "[a] reasonable jury may not infer dominion and control beyond a reasonable doubt from the defendant's physical distance from the drugs alone." *Id.* at 820. Mere proximity is thus not enough to establish dominion and control. *See id.* at 820 ("Some additional evidence of dominion and control is required before a finding of constructive possession can be made beyond a reasonable doubt."). Jenkins's attire, which indicated he had been in the apartment for a long time or was planning to stay, and the presence of the two scales was not enough to show dominion and control given that Jenkins's fingerprints were not found on the contraband items, the contraband was not being used, and no cocaine residue was present on Jenkins. *Id.* This Court accordingly found insufficient evidence to establish constructive possession, and overturned the jury's conviction of Jenkins.

### C. District Court's Opinion

After Bates was convicted by the jury, he filed a motion for judgment of acquittal under Fed. R. Crim. P. 29.[1] Bates's focus is on count I, possession with intent to distribute 100 grams or more of heroin.[2] It was undisputed that Bates lacked actual

---

[1] Bates also filed a motion for a new trial under Fed. R. Crim. P. 33, which was denied. Bates does not appeal the District Court's decision on this ground.
[2] The required elements for possession of a controlled substance with intent to distribute are: (1) knowing or intentional (2) possession (3) with intent to distribute (4) a controlled substance. *United States v. Lacy*, 446 F.3d 448, 454 (3d Cir. 2006).

possession of the heroin, so the issue was whether Bates constructively possessed the heroin. This Court has stated that:

> "Constructive possession exists if an individual knowingly has both the power and the intention at a given time to exercise dominion or control over a thing, either directly or through another person or persons. Constructive possession necessarily requires both dominion and control over an object and knowledge of that object's existence."

*United States v. Cunningham*, 517 F.3d 175, 178 (3d Cir. 2008) (quoting *United States v. Iafelice*, 978 F.2d 92, 96 (3d Cir. 1992)).

The District Court concluded that the Government's evidence in this case is "far stronger than the evidence in *Brown* and *Jenkins*." *United States v. Bates*, No. 09-cr-33-1, 2010 WL 3421118, at *6 (E.D. Pa. Aug. 26, 2010). In reaching this conclusion the District Court relied upon the following facts: (1) Bates previously resided at 1474 Lardner Street; (2) Bates possessed a key to the building; (3) Bates exited 1474 Lardner Street and immediately proceeded to engage in a drug transaction; (4) Bates was arrested across the street from 1474 Lardner Street, and the officers found twelve packets of crack cocaine and a firearm on him at the time of his arrest; (5) at the time of the arrest, 1474 Lardner Street was a "crack house" where no one resided; and (6) expert testimony that, because the street value of the drugs exceeded $200,000, only trusted members of the drug distribution group would have access to the building.

The District Court elaborated on the significance of three of these facts. First, the District Court stated that a jury could have reasonably considered that on the date of arrest, 1474 Lardner Street was a "crack house, that is, a dwelling used exclusively for the use and distribution of drugs." *Id*. at *7 (citing *Brown*, 3 F.3d at 683). This

conclusion was premised on the fact that no one resided in 1474 Lardner Street at the time.

Second, because of the expert testimony that the large amount of heroin seized would be kept in a secure location to which only members of the drug organization would have access, the fact that Bates possessed a key to the residence held extra significance. The key indicated that Bates "could enter the building unimpeded and had unfettered access to its contents." *Id.* Thus, the District Court concluded the Government was "entitled to the inference that because Bates had a key to this 'crack house' where large quantities of heroin were kept, the drug organization trusted him with unsupervised access to the heroin." *Id.*

Third, and finally, the District Court stated the jury could have reasonably considered the evidence that Bates engaged in drug trafficking on the block where 1474 Lardner Street is located.[3] This was based upon his immediate exit from the house before selling crack cocaine to the CI, and his arrest directly across from 1474 Lardner Street where he was found to have twelve bags of crack cocaine and a loaded 9mm firearm.

### D. The District Court's Order Erred in Finding Sufficient Evidence to Establish Constructive Possession

---

[3] The District Court correctly stated that although the appellant was acquitted on count III, it is proper to consider all evidence presented by the government regardless of how the jury finds on some counts. *See United States v. Powell*, 469 U.S. 57, 67 (1984) ("This [sufficiency-of-the-evidence] review should be independent of the jury's determination that evidence on another count was insufficient."); *Virgin Islands v. Martinez*, 620 F.3d 321, 332–33 (3d Cir. 2010) ("In sum, the jury's acquittal on the other counts 'is irrelevant to our singular focus on and determination of whether the evidence adduced at trial supports' the conviction on Count Three.").

We believe the District Court improperly distinguished *Brown* and *Jenkins* from the facts of this case. A proper reading of our precedent makes clear that the facts are insufficient to support the jury's conviction.

First, the District Court labeled 1474 Lardner Street a "crack house." This distinction, if appropriate, would strengthen the District Court's reasoning. Under dicta in *Brown*, and the Eighth Circuit decision in *Brett*, if 1474 Lardner Street is viewed as a "crack house" then access to the house helps the Government demonstrate dominion and control over the contraband inside. The Government argues that in reviewing this case in the light most favorable to it, we should conclude that a finding of dominion and control is proper because of Bates's possession of the key to 1474 Lardner Street, which it considers a "crack house" or a "stash house."

But this case presents a factual situation very different from *Brett*; Bates previously lived in the home and retained his key to the residence. Bates's possession of the key and his one entrance to the house are thus less inculpatory than the key and access in *Brett*. Moreover, the "crack house" in *Brett* was fortified with reinforced doors and windows and was not used as a residence. The house at 1474 Lardner Street was not fortified, was used as a residence three weeks earlier, and new tenants were scheduled to move in only three weeks later. In *Brett*, the only reason to have a key that gave access to the fortified "crack house" was the drugs contained therein. The fortified "crack house" designation created a proper inference, when considered along with the other facts of

14

*Brett*,[4] that the key and access demonstrated dominion and control over the drugs therein. In this case, 1474 Lardner Street lacks the fortified features present in *Brett*, and the arrest of Bates lacks the incriminating facts surrounding the arrest in *Brett*, so it is not proper for a jury to conclude that Bates's possession of the key and entrance into 1474 Lardner Street on one occasion provide the evidence of dominion and control.

Second, the District Court erred when it stated that because Bates possessed the key, he "could enter the building unimpeded and had unfettered access to its contents," and therefore had dominion and control of the narcotics. *Bates*, 2010 WL 3421118, at *7. This statement ignores the holding in *Brown* that the possession of a key cannot provide substantial evidence to show dominion and control. *Brown* clearly establishes that having "unfettered access" to the house and its contents, absent other evidence, is not enough to support a finding that the defendant had dominion and control over the drugs contained therein. Indeed, the defendant in *Brown* lived in the home, kept possessions there, would have been near the drugs frequently because they were in the kitchen and bedrooms, and was trying to access the home while drugs were inside. Yet even that evidence was insufficient. Here, the evidence only establishes that Bates was in the 1474 Lardner Street residence once since he moved out. Furthermore, there is no evidence Bates kept possessions in the house, no evidence he was in the house when the heroin

---

[4] "[T]he appellant in *Brett* was found fleeing from the crack house when the police arrived; he falsely identified himself at the time of arrest; and he was found at the time of his arrest with $3,746 in cash in his possession, but would not explain how he had obtained the money. In short, his possession of the key to the house was only one among a number of factors all of which supported the conclusion that he knew about and had dominion and control over the drugs found in the crack house." *Brown*, 3 F.3d at 684 (internal citations omitted).

15

was in the house, and no evidence he was in close proximity to the drugs. This evidence then must also be insufficient. Further, *Jenkins* makes clear that even if one is sitting directly next to drugs and drug paraphernalia and is aware of their presence, more evidence demonstrating dominion and control must be shown. *Jenkins*, 90 F.3d at 820 ("Some additional evidence of dominion and control is required before a finding of constructive possession can be made beyond a reasonable doubt.").

*Brown* makes clear that living in a residence, having access to the residence, and having a key to the residence, are together insufficient to establish dominion and control. Something more is needed. The Government proposes this Court should hold that the key and access in this case are sufficient to show that Bates had access to the drugs, as well as permission from unidentified persons to exert dominion and control over them. We do not accept this proposed conclusion, however, because there is no evidence showing that the key and access to the home were given, or approved of, by some unidentified party, and were intended to give Bates dominion and control over the heroin. Holding otherwise would circumvent *Brown*. In *Brown*, the residence, access, and key were insufficient to establish dominion and control, so here the access and key, without other evidence connecting Bates to the heroin, cannot be sufficient to establish dominion and control.

While the Government is entitled to have the evidence viewed in a light most favorable to it, that does not mean we must view the key as proof that Bates exercised dominion and control over the heroin, particularly when the Government has offered no evidence to prove such a conclusion. According to Callaghan's expert testimony, Bates's

16

access to the house, via the key, shows he was part of what must have been a larger organization. But that is the sole evidence the government has to establish dominion and control of the drugs in the upstairs bedroom, and it is insufficient under *Brown* and *Jenkins*. Bates's fingerprints were not found in the room containing the drugs, there is no evidence that he was in the room containing the drugs, no evidence he knew of the heroin, and the packaging Bates possessed for the crack was different than the packaging discovered with the heroin. Further, a Hispanic name was on the credit card found in the room with the drugs, and the writing in the tally book was largely in Spanish. Neither of these facts implicates Bates. Lastly, nothing has been shown that whoever placed the heroin in 1474 Lardner Street explicitly gave Bates permission to enter the home in which he used to reside using the key he retained from his residence there.

Comparing the facts in this case to *Jenkins* highlights the dearth of evidence regarding access to the heroin that the key allegedly provided. Unlike *Jenkins*, Bates was never found in the room containing the drugs. Like *Jenkins*, there was no heroin residue on Bates's clothes or person. In *Jenkins*, this Court concluded the evidence was insufficient to demonstrate dominion and control over the narcotics; by extension a similar conclusion is warranted under the facts in this case.

Finally, the District Court gave too much weight to the fact that Bates was engaged in drug trafficking on the same block as 1474 Lardner Street. Bates's activities do not connect him to the *heroin* because he was dealing *crack*. The possession of crack also does not show any connection to the packaging paraphernalia found in 1474 Lardner Street since the packaging of the crack did not match the packaging discovered in the

17

house. This is not to say it has no significance; it demonstrates that Bates possessed illegal drugs with the intent to distribute them, a crime for which Bates was convicted. But the Government is not entitled to the inference that because Bates was dealing crack in the area, he must have also been involved in trafficking heroin. The Government can place Bates in 1474 Lardner Street on the day before his arrest, but it has shown nothing further. It has not demonstrated that his time inside the house was related to his sale of crack, since no crack, and none of Bates's possessions were found within the house. Additionally, it cannot show that his sale of crack outside the house was related to the storage of heroin inside the house, since nothing discovered with the heroin and paraphernalia can be traced to Bates.[5]

The Government's insistence that it is entitled to have the record reviewed in a light most favorable to it is undoubtedly true. The Government, however, seeks not only reasonable inferences, but speculative conclusions that are inappropriate. The line between reasonable inferences and speculation is narrow and tough to define. If more evidence was provided connecting Bates to the heroin then the Government's argument

---

[5] The District Court did not address the Government's theory of conviction that it raises in this appeal—that the jury concluded the appellant was armed because he was guarding 1474 Lardner Street. No evidence has been provided that connects the handgun on Bates to the heroin in 1474 Lardner Street. The only facts the Government can point to regarding this argument is that Bates was near the house the day before his arrest, was there a "short time" according to Toomer's testimony, and then again on the day of his arrest when the officers arrived to execute a search warrant on 1474 Lardner Street. We must make all reasonable inferences in the Government's favor, but to find that these facts alone provide substantial evidence from which a jury could conclude Bates was an armed guard is to cross the line from inference to pure speculation. Accordingly the Government is not entitled to the inference that the gun represented Bates's assignment to protect the contents of 1474 Lardner Street or that his presence was "surveillance" intended to protect the drugs.

that he exercised dominion and control could cross the line and no longer be speculative. But *Brown* and *Jenkins* dictate that the facts of this case do not demonstrate substantial evidence of dominion and control to uphold the jury's decision.

The District Court erred in distinguishing this case from *Brown* and *Jenkins* in the ways discussed above. The evidence, viewed in the light most favorable to the Government, cannot support a finding that Bates had dominion and control over the heroin. Accordingly, this Court will reverse Bates's conviction on count I.

## V. Conclusion

For the foregoing reasons, we will affirm Bates's conviction on counts II and IV and reverse his conviction on count I. We will vacate his sentence and remand to the District Court for sentencing proceedings consistent with this opinion.

*United States v. Bates*
No. 10-4439
HARDIMAN, *Circuit Judge*, dissenting.

The jury unanimously determined beyond a reasonable doubt that Rashaan Bates constructively possessed heroin stashed at the residence he had recently vacated. The seasoned trial judge, after giving careful consideration to the applicable precedents, found the evidence sufficient to support the conviction. We should affirm that decision.

I

In a constructive possession case, the Government must establish that the defendant "knowingly has both the power and the intention at a given time to exercise dominion or control over a thing, either directly or through another person or persons." *United States v. Iafelice*, 978 F.2d 92, 96 (3d Cir. 1992). Although we have found that "mere proximity to the drug, or mere presence on the property where it is located or mere association with the person who does control the drug or the property[] is insufficient to support a finding of possession[,] . . . dominion and control need not be exclusive but may be shared with others." *United States v. Davis*, 461 F.2d 1026, 1035–36 (3d Cir. 1972).

II

As it was required to do, the District Court reviewed the evidence in the light most favorable to the verdict. That evidence includes the following pertinent facts.

Bates's mother leased 1474 Lardner Street in Philadelphia (the Premises) for one year, from August 9, 2008, until September 10, 2008. Bates lived with her there for about the last six months of her tenancy and listed the Premises as his residence on his

1

Pennsylvania driver's license. About six days after her tenancy expired, Bates's mother returned her keys to the property manager, Tom Zhang.

Bates remained active on the 1400 block of Lardner Street after September 10, 2008. On October 7, 2008, Philadelphia Police Officers witnessed Bates selling crack cocaine to a confidential informant on the front steps of 1471 Lardner Street. Shortly before that controlled purchase, Officer Harold Toomer saw Bates exit the Premises and cross the street. After the drug deal, Bates crossed the street again and entered 1446 Lardner Street.

Based on the foregoing, search warrants were procured for the two properties Bates had entered or exited (1446 and 1474 Lardner). When officers arrived to execute the warrants on October 8, 2008, they found Bates again sitting on the front steps of 1471 Lardner. A search of Bates's person yielded twelve packets of crack cocaine and a loaded Intratec nine-millimeter Luger semi-automatic handgun with an obliterated serial number. And despite the fact that Bates's mother testified that her son never had a key to the Premises, officers found a key to that residence on Bates's person.

Inside the Premises, officers found 707 grams of heroin, including "bulk heroin [and] packaged heroin, . . . heroin paraphernalia used to package heroin," a credit card covered in heroin residue, a ledger book written mostly in Spanish, a rubber stamp bearing the word "Chicago," and a box containing blue and green glassine packets. There were no beds in the Premises and almost no furniture. Officer Brian Myers described the Premises as follows:

When you first walk into 1474 Lardner Street, you walk into a living room. I remember there was a couch and a TV. That was the only thing down there. There was nothing in the kitchen, nothing in the dining room. As you walk in the front door to your right, there was [sic] stairs to go upstairs, you go upstairs. In the front room there's a table and I think one or two chairs. No bedroom set that I remember and no furniture in any other—I think there was [sic] two other bedrooms but no furniture in them.

Like Officer Myers, property manager Zhang testified that as of October 8, 2008, the Premises, which he had secured with a lock box a few weeks earlier, was unoccupied.

The jury also heard testimony from a Government expert, Detective Andrew Callaghan. Callaghan opined that the crack cocaine found on Bates was likely meant for sale rather than for personal use because Bates was not carrying any user paraphernalia. Noting that Bates carried a handgun, Callaghan explained that "it's extremely, extremely rare that a user [who is] just purchasing any type of illegal drug would possess a loaded firearm."

Callaghan further testified that the heroin found at the Premises could be sold for well over $200,000 and explained that such a large quantity would be stored in a secure location and sold elsewhere to evade detection by police or potential thieves:

I've never seized a large amount of heroin in an open location where other people had access to it. Drug organizations usually secure and secrete the evidence. You know, if there's a location that drugs are stored at, if it's this amount, they usually don't conduct sales out of it because . . . they don't want law enforcement to detect that location . . . and [because of] street thugs, is what we call them, you know, guys that commit a robbery on a drug house because those types of robberies are seldom, if ever, reported. . . . So that's the main reason why they keep a separate and secure location.

Callaghan also testified that because "[i]t would take multiple persons in order to sell this heroin to be able to pay that shipment off," the operation likely involved "[m]ore than

3

one individual." He went on to explain that while the majority of heroin in Philadelphia is distributed by Hispanics and "usually the leaders of an organization in a heroin trade are Latino[,] . . . often the customers and the workers aren't."

To sum up, the evidence showed that Bates was an armed drug dealer who impermissibly retained a key to a locked Premises where over $200,000 of heroin was seized and that the seizure occurred on a day when Bates was eyeballing the Premises, the day after Bates was seen leaving it.

III

In light of the undisputed facts, two questions arise: to whom did the heroin belong, and who was in charge of it while it was stashed at the Premises? I agree with Bates that the evidence supports the conclusion that the heroin belonged to one or more Hispanics. This theory is well supported not only by the documents written in Spanish and the Hispanic name on the credit card used to cut the heroin, but also by the testimony of the Government's expert, Detective Callaghan. But who was in charge of the heroin while it was stashed at the Premises?

The record indicates that two people had access to the locked Premises: Zhang, the property manager, and Bates. Although it is theoretically possible that Zhang allowed the drug cartel to use the Premises to stash and process the heroin, the jury rationally concluded that Bates—the armed drug dealer who operated across the street from the Premises and was seen exiting the Premises the day before the seizure—was watching over the Premises where the heroin was stashed.

4

My colleagues conclude that this case is indistinguishable from our two most germane precedents: *United States v. Brown*, 3 F.3d 673 (3d Cir. 1993), and *United States v. Jenkins*, 90 F.3d 814 (3d Cir. 1996). As the District Court explained, however, the evidence presented against Bates was markedly stronger than the evidence in either *Brown* or *Jenkins*. "In addition to evidence that Bates previously resided at 1474 Lardner Street and possessed a key to the building," the Government also showed: (1) on the day prior to his arrest, "Bates exited 1474 Lardner Street and immediately proceeded to engage in a drug transaction;" (2) "Bates was arrested across the street from 1474 Lardner Street" with crack cocaine and a firearm on his person; (3) "1474 Lardner Street was a crack house[1] where no one resided;" and (4) "only trusted members of the drug distribution group would have access to the building." *United States v. Bates*, No. 09-33-1, 2010 WL 3421118, at *7 (E.D. Pa. Aug. 26, 2010). The District Court held that "[t]hese additional pieces of evidence, viewed in the light most favorable to the Government and in conjunction with the entirety of the evidence in this case, [were] sufficient for the jury to find Bates guilty beyond a reasonable doubt of possession with intent to distribute 100 grams or more of heroin." *Id.*

I agree with the District Court for several reasons. First, the jury could reasonably have concluded that on the day of Bates's arrest, the Premises was not a home, as in *Brown*, but rather a "dwelling used exclusively for the use and distribution of drugs." *Brown*, 3 F.3d at 683. Second, the jury was entitled to credit Callaghan's expert opinion

---

[1] The use of the phrase "crack house" is not accurate because the seizure at the Premises yielded no crack cocaine. This misnomer is immaterial, however, because the point here is that the Premises was unoccupied.

5

that only trusted members of the drug organization would have access to such a large quantity of heroin.  Third, the jury could infer from Bates's possession of the key—which, curiously, his mother denied he ever possessed—that, unlike Jenkins, Bates "could enter the building unimpeded and had unfettered access to its contents." *Bates*, 2010 WL 3421118, at *7.  Finally, the jury could consider the fact that "Bates engaged in drug trafficking on the 1400 block of Lardner" and was found across the street from the Premises with crack and a loaded firearm "that was a tool of the drug trade." *Id.* at *8.

IV

Among the several factors cited by the District Court, the most significant distinguishing characteristic is that the heroin was found in a vacant home that was being used to stash, cut, and package the drug.   In *Brown*, we reversed the conviction of Ama Baltimore, who had been arrested as she entered her own home during a police search.  3 F.3d at 673.  Essential to our decision was the fact that the property had a legitimate use, *i.e.*, as a residence.  *Id.* at 683–84 ("Possession of the key to [a] crack house would indicate a much greater likelihood that the defendant was involved with the drugs found therein than [his] possession of a key to [a] home, which was used not only for drug-related activity but also as a residence.").  My colleagues note that the Premises was "not fortified, was used as a residence three weeks earlier," and was scheduled to receive new tenants "only three weeks later," to suggest that it is not analogous to the "fortified drug house" raided in *United States v. Brett*, 872 F.2d 1365 (8th Cir. 1989).  But the fact that the Premises was not "fortified" does not detract from the plain fact that it was a secure location used only for illicit purposes during the relevant time period.

6

My colleagues correctly note that we have said that the *Brett* defendant's "possession of the key to the house was only one among a number of factors all of which supported the conclusion that he knew about and had dominion and control over the drugs found in the crack house." *Brown*, 3 F.3d at 684. They are also correct that the evidence of guilt was more pronounced in *Brett* than in this case. This does not mean, however, that a reasonable jury could not have convicted Bates. His possession of the key to the Premises was just one of many factors that supported the jury's decision. The fact and location of Bates's drug dealing, his loaded semi-automatic weapon, and the expert testimony regarding the heroin were all before the jury.

Nor am I persuaded by the Majority's application of *Jenkins* to this case. The defendant in *Jenkins* was arrested in the home of an acquaintance while sitting in front of a coffee table strewn with drugs and packaging materials. 90 F.3d at 816. There was no evidence that he possessed a key to the apartment or had ever visited it while its owner was absent. *Id.* at 820. Unlike Bates, Jenkins was deemed a social guest who was not permitted to access the drugs on his own. *Id.* at 820–21.

After we decided *Brown* and *Jenkins*, we held in *Jackson v. Byrd* that a state trial court's findings of fact sufficiently supported Christine Jackson's conviction for constructive possession of drugs found in her brother's bedroom, which was located in the apartment she was leasing. 105 F.3d 145, 150 (3d Cir. 1997). We distinguished *Jenkins*, noting that while "there were adults other than the appellant inside" the home where the police arrested Jenkins, "Jackson's situation was different because . . . except

7

for her young son, she was alone in the apartment when the police executed the warrant [and] had ready access to the drugs as they were in the unlocked rear bedroom." *Id.*

*Jenkins* is distinguishable from this case for the same reason. The few cases, like *Brown* and *Jenkins*, in which federal appellate courts have found insufficient evidence to support a jury's finding of constructive possession, share a common theme noticeably absent here. In those cases, the defendant was either accompanied by or living with another individual who exercised dominion and control over the drugs confiscated at the scene. *See, e.g.*, *United States v. Scofield*, 433 F.3d 580, 585–86 (8th Cir. 2006) (defendant was present in a drug dealer's home while the dealer sold methamphetamine to an informant); *United States v. Valadez-Gallegos*, 162 F.3d 1256, 1262–63 (10th Cir. 1998) (defendant was a passenger in a vehicle in which ephedrine was found); *United States v. Valenzuela*, 596 F.2d 824, 830–31 (9th Cir. 1979) (defendant lived with her husband on the premises where heroin was found and attempted to push the door shut when officers tried to execute warrant); *Arellanes v. United States*, 302 F.2d 603, 606–07 (9th Cir. 1962) (defendant lived with her husband in an apartment where drugs were found and accompanied him in the car in which drugs were transported).

Like Christine Jackson—whose conviction we affirmed—Bates was the only adult seen either entering or exiting the Premises in the two days leading to his arrest. Bates carried a key, enjoyed unfettered access to the drugs, and had "some appreciable ability to guide the destiny of the drug." *United States v. Staten*, 581 F.2d 878, 883 (D.C. Cir. 1978). And even more telling than in Jackson's case, Bates was dealing drugs and toting a loaded semi-automatic weapon.

8

## V

This is not a case like *Brown*, where the defendant had a legitimate reason to carry a key to a home where drugs were found. Nor is it a case like *Jenkins*, where the defendant's access to the drugs was dependent upon another person. Like Ama Baltimore, Bates carried a key giving him unfettered access to the home and, like Jenkins, he was in close proximity to the drugs as he exited the Premises. Although we have held that these factors do not alone suffice to demonstrate constructive possession, we have never found that they are inadequate when considered together and with other evidence, including a defendant's history of drug trafficking, his armed monitoring of the location, and an expert's testimony that access to that location would be limited to trusted confederates of the drug ring.

The evidence against Bates can be construed as pointing to either innocence or guilt, but characterizing it in the light most favorable to the Government reveals that the jury's decision to embrace the latter conclusion was reasonable. Because a rational jury could and did conclude that Bates had constructive possession over the heroin at the Premises on the day of his arrest, I respectfully dissent.